IN RE ESTATE OF MARY SQUIRE, Deceased.

**LIMITATION OF ACTIONS:** Maturity on Happening of Event. A
1   note maturing "only when the homestead where I now reside
shall be sold or converted into money," is *not* matured by a sale
of a portion of the homestead unoccupied by buildings, the note
reciting that the money was for improvements "on the (home-
stead) buildings."

**EXECUTORS AND ADMINISTRATORS:** Claims Against Estate—
2   —Services by Members of Family. Recovery cannot be had for
nursing one member of a family by another member of the same
family without first overthrowing the presumption of law that
such services were gratuitous. The helplessness of the one nursed
will not overthrow the presumption.

PRINCIPLE APPLIED: Plaintiff, at the time when her
mother was 94 years of age and suffering from senile dementia
and in a semi-conscious condition, took said mother into her own
home and cared for and nursed her until her death. The mother
performed no services in the family, remaining helpless and in
a semi-stupor until her death, three months later. During these
three months plaintiff collected $125 in money belonging to her
mother, $75 of which she applied in payment of her mother's
board, room and washing, and after paying some other small
items had a balance of $27, which she turned over to the
executor of her mother's estate after the death of the mother.
*The expectation of plaintiff to receive pay for "nursing" her
mother was formed after her mother's death,* and arose out of
the fact that another heir was enforcing a note against the
mother's estate. *Held,* plaintiff could not recover.

**FAMILY RELATIONS:** Family—What Constitutes. One who takes
3   her aged and helpless mother into her own home and cares
for her thereby constitutes the mother a member of the family.

*Appeal from Wapello District Court.*—HON. F. W. EICHEL-
BERGER, Judge.

MONDAY, JANUARY 25, 1915.

ACTION to establish claims against a decedent. The opinion states the facts. *Reversed* in part and *Affirmed* in part.

*Roberts & Webber* and *Sims & Kuehnle*, for appellant.

*Work & Work*, for appellee.

GAYNOR, J.—Mary Squire died on the 21st day of January, 1913, and Frank L. Root was duly appointed executor of her last will and testament. Anna H. Sims and Clara S. Root, claimants herein, are daughters of Mrs. Squire.

1. LIMITATION OF ACTIONS: maturity on happening of event.

On the 28th day of March, 1913, Anna H. Sims filed a claim against the estate of her mother for the sum of $514.00, and based said claim on the following note executed and delivered to her by her mother:

"$150.00                    Ottumwa, Iowa, June 5, 1878.

"For value received I promise to pay Anna H. Squire the sum of one hundred and fifty dollars, said sum being for money earned by her in teaching music and applied to the payment of blinds and lightning rods on building where we reside, and it is understood that this note shall become due only when the homestead where I now reside shall be sold or converted into money, with seven per cent interest annually."

To the allowance of this claim, the executor filed the following objections:

"1. That the note by reason of a sale of part of the homestead on or about May —, 1902, became due and payable, or that suit might have been brought thereon.

"2d. That the homestead referred to included the part and parcel of land then sold and converted into money to the extent of $1,000.00, and action might have been brought upon said alleged note.

"3d. That more than ten years elapsed before the de-

cease of the maker thereof, and that said note was fully barred by the statute of limitations before the decedent's death.

"4th. That no part of said homestead has been sold or converted into money except as above stated up to the present time, and on no other account is said note now due or collectible."

Upon a hearing before the court, the full amount of the claim was allowed, and from this action of the court, the executor appeals.

An examination of the record shows that at the time the note was executed, Mrs. Mary Squire was occupying as a homestead certain property in the city of Ottumwa; that this was the property referred to in the note; that she continued to occupy the same up to the time of her death. It is claimed that a portion of this homestead was sold in 1902; that this matured the note, and, therefore, the note at the time it was filed with the executor was barred by the statute of limitations. It appears that the *building* mentioned in the note was the *building* occupied by Mrs. Squire at the time the note was given and at the time of her death. The number of the lot on which the building was situated was 102, in Block 5. Seventy-four feet off the north end of the lot was deeded to one Emory after the execution of the note, but the portion of the lot occupied by the building as a home still remained a homestead up to the time of Mrs. Squire's death.

The only question argued is as to whether or not, under the terms of the note, the selling of a portion off the north end of the lot matured the note so as to start the running of the statute of limitations. The mere statement of the proposition is a sufficient answer. We think the claim of Anna H. Sims was rightly allowed.

On the 4th day of April, 1913, Clara S. Root, the other

daughter, filed a claim against her mother's estate for serv-

2. EXECUTORS
AND ADMINIS-
TRATORS :
claims against
estate: serv-
ices by mem-
bers of
family.

ices as nurse and for care of her mother from October 23, 1912, to January 22, 1913, at $20.00 per week. To this claim Mrs. Anna H. Sims filed objections, she being a beneficiary ·under the will of her mother. The objections filed are as follows:

"1st. The alleged services for which such claim is made were rendered gratuitously without any arrangement or understanding that compensation should be made therefor.

"2d. Compensation for such services was never expected or anticipated by said. claimant, nor was there any understanding, on the part of the deceased, that compensation should be exacted therefor."

On the 7th day of November, 1913, this claim was also allowed by the court upon a hearing, and from this allowance Mrs. Anna H. Sims appeals.

Clara S. Root called on her own behalf testified: "My mother's last illness dated from October 13, 1912. She was then in her own home. Ten days later, she was taken to my house. No other of my mother's children was there to take care of her. She had a paralytic stroke about 1908. She was afterwards ill of pneumonia and she had another illness bordering on pneumonia. She had various illnesses caused by the heat of the summer prior to her last illness. She was ninety-four years old when she died. She died on the 21st day of January, 1913. After her last illness and up to the time of her death, her general condition was that of semiconscious, semi-stupor. She could be raised, but she usually laid in a stupor. Sometimes she knew me. Once she seemed to know where she was. She would gaze about the room but she wouldn't speak."

F. L. Root, husband of claimant and executor of the estate, testified "that his wife cared for her mother while she

was at his house during her last illness; that she fed her and moved her, changed her bed and moved her from one position to another, and attended to her wants in every respect."

There is no question in the record and none is made by counsel as to the care received by Mrs. Squire from her daughter during her last illness, administered to her in the daughter's home.

Dr. Herrick, a physician, stated that he was called to attend her during her last sickness; that she got up occasionally, but on one or two occasions fell, not knowing what she was doing most of the time. "There was no objective in her movements. She would stray into the kitchen when she intended to go somewhere else. Mrs. Root gave her attention and care. Mrs. Squire was suffering from senile dementia. There was evidence of an apoplectic effect. She was not competent to take care of herself. When I saw her first she was in her own home. Afterwards, in the home of her daughter; Clara S. Root." ·

Mary E. Root, daughter of claimant, testified that her "grandmother couldn't raise her hand to her face. I saw my mother take care of her. · She lifted her bodily very often and fed her her meals. She couldn't raise herself in bed. I was home during Thanksgiving and at Christmas time. Grandma did not seem to know me when I came. She was almost always in bed. I was home three weeks at Christmas time and three days at Thanksgiving."

J. W. Squire, the son of Mary Squire, testified that during the summer of 1912 he visited his mother and she said to him as follows: " 'Wilson, I want you to know what a comfort and help Clara has been to me, and now is. She is in here to see me every day. She sends me nice things to eat, cooked herself. It is very little I can eat and enjoy you know. My children are here and help me and some of them stay with me at night. I don't know what I would do without Clara's help.' I saw her the month my mother passed

away. She was then with my sister, Mrs. Root. She was very feeble. She could not speak. She did not know me, couldn't move her hands. She could raise one hand a little, but could not move herself at all. Clara, my sister, did all that was done for mother. When I visited her in August, 1912, and had the conversation with her referred to, she was living in the house in which she had lived for fifty years. That was the old homestead of the Squire family.''

It appears also that during the time that Mrs. Squire remained with the claimant, her daughter, the claimant collected $72.00 pension money; $30.00 from a brother and $21.00 rent, and $1.75 for fuel, making a total of $124.75, money belonging to her mother, out of which she paid to her husband, $75.00 for her mother's board, which she thought was a fair compensation for board, room, and washing. She paid some other small items, and there was a balance of the amount collected of $27.08, and this she turned over to the executor after her mother's death.

The only positive evidence of any expression of any intent on the part of the claimant to charge or not charge for the services rendered her mother during her last sickness is found in the testimony of Mrs. Sims, as follows:

''What, if anything, did your sister Clara say to you at either of these times with reference to the pension money of your mother, or your mother's income during the time that your mother remained at your sister's home?''

A. ''I said, 'Clara, Jacob and I feel that you should have some recompense for your care of mother.' She said, 'Anna, I took the money that came to mother and used it. I thought it was right, and I needed it, and I shall make no other claim.' That was the last she said.''

The claimant testified upon this point, referring to this conversation testified to by Mrs. Sims: ''My sister said (meaning Mrs. Sims), 'We want you and Frank to be paid

for your care of mother.' I said, 'I used mother's money as it came in. I felt I had a right to. It was because I had the entire responsibility for her.' I referred to her income, her pension money, and money she regularly received from my brother, and rent from part of the house, and the trifle of money for fuel that she left and I sold. We were discussing at the time the arrangements for the funeral. My sister said, 'Jacob and I want you to be well paid for caring for mother.' I said, 'I don't want any pay for caring for mother.' I meant by that, however, the general care of mother for the last twenty years. We weren't speaking of the services I rendered at all. She said, 'for my care of mother,' and that, to my mind is a totally different thing."

The claimant was then asked this question:

Q. "Did you or did you not at the time have in mind the idea that you were going to charge your mother for what you had done for her?"

A. "I had no thought of any business on earth on my mind."

Q. "You did not have in mind that you were going to charge her anything?"

A. "I had not in my mind one way or the other that I was going to charge her any consideration at the time."

Q. "You did say to her, 'I don't want any pay for caring for mother?'"

A. "'Caring for mother,' I did not say for nursing my mother."

Q. "When you say nursing your mother, nursing or caring for her, did you have in mind the thought that you were going to charge her for this service?"

A. "Yes, when I was doing the nursing I thought I should be paid for it."

Q. "Did you not write Mrs. Sims a letter on the 15th day of March, 1913, in which you used this language: 'If your note is a just and legal claim, then surely I may claim

a fair compensation for ordinary work, faithfully performed. If you press your claim, I shall press mine'?"

A. "Yes, sir."

This is all the material testimony upon the question here to be determined. There is no evidence of any express contract, between the claimant and her mother, for compensation for the services claimed.

Since the decision of *Scully v. Scully*, 28 Iowa 548, this rule has been adopted and followed persistently in this state, to wit: "Ordinarily, and without more, where one person renders services for another, which are known to and accepted by him, the law implies a promise, on his part, to pay therefor. But where it is shown that the person rendering the service is a member of the family of the person served, and receiving support therein, either as a child, a relative or a visitor,. a presumption of law arises that such services were gratuitous; and in such case, before the person rendering the service can recover, the express promise of the party served must be shown, or such facts and circumstances as will authorize the jury to find that the services were rendered in the expectation by one of receiving, and by the other of making, compensation therefor."

As said in *Cowan v. Musgrave*, 73 Iowa 384, 388, "The presumption that the parties do not contemplate payment for such services 'may be overthrown by proof of an express or implied contract; an implied contract being proven by facts and circumstances which show that the parties at the time the services were performed, contemplated or intended pecuniary recompense.' "

The court in this case cites and approves the rule in the *Scully* case, *supra*.

In *Traver v. Shiner*, 65 Iowa 57, a case in which a son sought to recover for services rendered his father while his father was a member of his family, the court, in passing upon

plaintiff's claim, said: "The plaintiff does not deny that the intestate during the time covered by his claim, was a member of his family. . . . He insists that an express contract may be inferred from declarations and other circumstances, and that the evidence in the case authorized the conclusion reached by the jury that there was an understanding between the parties, that plaintiff was to receive compensation from the intestate." The court further said: "All the evidence upon this point which is relied upon by plaintiff, consists of declarations of third parties, in which the intestate said that he was receiving support from the plaintiff, and that he intended some day or other to make it right, and that he had some land, and when he disposed of it, he intended to pay his way to George (the plaintiff) and his wife. There is not one word tending to authorize the conclusion that there was any expectation on the part of *plaintiff* to claim or receive compensation from his father. . . . The meager evidence above stated, does not tend to raise an inference of a contract."

The rule is not disputed. The question is, does the case made here bring the plaintiff's claim within the rule? It is claimed that Mrs. Squire was not a member of claimant's family at the time the services were rendered, and reliance is had upon what is said in *Wence v. Wykoff*, 52 Iowa 644. It must be conceded that if what is said by way of argument in that case is sound, it would tend to support claimant's contention, but the facts of that case are different from the facts as they appear in this case. It appears in that case that the deceased was the mother of plaintiff's wife; that for more than a year prior to her death, being advanced in years and infirm of health so that she could perform no labor and was incapable of supporting and taking care of herself, she requested the plaintiff to take her to his house and provide for her wants, which was accordingly done, and that she expressed a desire to pay plaintiff for her board and nursing,

with the fear that her property would not be sufficient for that purpose.

The facts in that case appear to be that she requested the plaintiff to render the services and furnish her the support which she received, and expressed her purpose to pay therefor; that the plaintiff was a poor man, hardly able to support his own family. From this, a conclusion was drawn that there was shown a purpose on her part to pay for the services rendered, and an expectation, on the part of the plaintiff, of receiving compensation; or, in other words, that the services were rendered in the expectation by one of receiving and by the other of making compensation therefor, and the thought expressed in that opinion that she was not a member of defendant's family, and the argument that she neither assumed nor discharged family duties, and was brought to the house simply for the purpose of receiving care necessary to prolong her life and for no other purpose, is bottomed on the thought that she requested him to bring her to his home and provide for her wants, and expressed a desire to pay plaintiff for such services.

While we think that case was rightly decided, we are not prepared to adopt all the reasons upon which the decision rests.

In this case, the claimant is a daughter, sustaining the closest possible relationship to another that is conceivable in human life. The daughter took the mother into her home at a time when she was wholly incapable of 3. FAMILY RE- LATIONS: consenting or objecting thereto. She took her family: what constitutes. into her family because she was her mother. She administered to her wants as a daughter should, moved thereto, no doubt, by that love and tenderness which a dutiful daughter feels for a stricken mother. As she said herself, there was no thought on her part of receiving consideration for her services. As said by counsel for claimant in his argument, "It is to her credit that she was not rendering the services to her mother with the thought of compensation."

If she was not a member of claimant's family, what relationship did she sustain to the family? Certainly not that of a stranger, from which relationship an implied contract might arise to pay for services rendered. The rule ought to be as broad as the reason upon which it rests. The reason why the rule heretofore referred to has been adopted is, that because of the relationship existing, there is no implied contract to pay or receive compensation.

We think the holding of the court in the *Wence* case, that the mother was not a member of the plaintiff's family, was based on the fact that she did not enter the family as a member, but on her own request that she might be cared for and her wants supplied, with an expressed desire on her part to pay for the board and nursing received.

*Harlan v. Emery,* reported in 46 Iowa 538, is also relied upon by claimant. In that case, the facts upon which the court made its finding that the mother was not a member of the family are not set out. We have no means of knowing upon what fact it is based. Certain facts are set out in the opinion, but the opinion shows that the case was not decided upon the facts therein set out. It does appear that the deceased rented rooms of the claimant. Indeed, her claim is for rent of house, and we think that the opinion must have been based upon the finding that she did not, in any way, enter the home of the son-in-law, and therefore is not authority upon the question here submitted.

We conclude that Mary Squire, at the time the services were rendered for which the claim is made, was a member of claimant's family; that there is no showing of any expectation on the part of the claimant of receiving compensation for the services, at the time they were rendered; or, in other words, that the services were rendered with no expectation of receiving compensation for the services, and no expectation, on the part of the mother, of compensating her therefor. We do not think that the fact that no services were rendered by Mrs. Squire, or the fact that she was incapable of rendering services, authorized the conclusion that her support was not

gratuitously provided for by the plaintiff. We think the case at bar is distinguishable from the cases relied upon by claimant.

It is, however, claimed that when necessities are supplied to a person who, by reason of his disability, cannot himself make a contract, the law implies an obligation on the part of such person to pay for such necessities out of his own property. Every person, whether of sound or unsound mind, can be made liable under an implied contract for necessities suitable to his state and condition in life; but we do not bottom the holding in this case upon the thought that there was no expectation on the part of Mrs. Squire to pay, but upon the fact of the relationship existing between the claimant and Mrs. Squire, and the circumstances under which the services were rendered, and the absence of any showing in the record of any expectation, on the part of the claimant, to receive compensation for the services rendered.

In the *Scully* case, it is said: "But where it is shown that a person rendering the services is a member of the family served, and receiving support therein, either as child, relative, or visitor, a presumption of law arises that the services were gratuitous." The converse of this proposition is true, and a child, relative, or visitor, rendering services to any member of the family in which he resides, where the services are rendered as a member of the family, is presumed to have rendered the services gratuitously. The obligation between all the members of the family is reciprocal, and all services rendered in the family to members of the family, as such, are presumed to have been rendered gratuitously.

We feel that the claimant has failed to establish her claim by evidence sufficient to justify its allowance, and the action of the court in allowing this claim was erroneous and, therefore, must be reversed.

*Affirmed* on Clara S. Root's appeal.
*Reversed* on Anna H. Sim's appeal.

DEEMER, C. J., LADD and SALINGER, JJ., concur.