LEWIS SODERLAND, Appellant, v. R. F. GRAEBER, Administrator, et al., Appellees.

**PARENT AND CHILD:** Support of Parent—Recovery. The *unusual*
1    character and extent of services rendered by one member of a family for another member of the same family, and the *unusual* circumstances under which such services are rendered, may be sufficient to overcome the presumption of gratuity, and to present a jury question on the issue whether the services were rendered by the one performing with the intent to charge therefor, and with the intent of the one receiving to pay therefor. So held where a son wholly abandoned his own business in order to care for his aged and crippled parent, and turned over to the parent the full fruits of his labor.

**LIMITATION OF ACTIONS:** Long-Continued and Unbroken Services.
2    When services are rendered for a long, continuous period of time, under an implied agreement for compensation, but wholly indefinite as to the period of employment, the statute of limitation does not commence to run until there is a break in the services.

*Appeal from Boone District Court.—*G. D. THOMPSON, Judge.

JANUARY 14, 1921.

PLAINTIFF filed his claim against the estate. Trial to a jury. At the close of all the evidence, interveners moved the court to direct a verdict for them, and the motion was sustained. The court dismissed and disallowed the claim, and rendered judgment against the claimant for costs. He appeals.—*Reversed.*

*Crom Bowen, W. W. Goodykoontz,* and *T. J. Mahoney,* for appellant.

*Harpel & Cedarquist, D. G. Baker, S. O. Wald,* and *A. B. Schuetz,* for appellees.

PRESTON, J.—1. On August 10, 1917, appellant filed his claim against the estate, claiming $5,000 for labor and services on the farm and services in nursing and caring for his mother,

1. PARENT AND CHILD: support of parent: recovery.

the deceased, continuously from 1882 to the time of her death, in December, 1915. On October 10, 1917, said claim was allowed by the administrator. On April 14, 1919, separate petitions of intervention were filed by two sets of grandchildren of the deceased, being the children of her two deceased daughters. The petitions ask that the approval be set aside, and that the claim be disallowed. The administrator filed no pleading. Interveners recite that they are heirs, and interested, and ask that they be allowed to defend, since the administrator wrongfully approved the claim, and declines to defend against it. The intervention by one set of heirs denies the claim of Lewis, and says that whatever services claimant rendered were rendered by him while residing with the decedent, as a member of her family; that they were gratuitous, and without expectation of compensation; that plaintiff has been fully paid by deceased in her lifetime, by exchange of services in the way of keeping house, doing the washing of and boarding claimant, and by delivery to him of cash and property at divers times, and by his appropriation to his own use, at divers times, of money and property belonging to deceased;

that so much of the claim as is for services rendered more than five years before the death of decedent is barred by the statute of limitations. Other interveners say that, as heirs and distributees, they have an interest adverse to the claimant, Andrew Soderland, filed against said estate, and that the administrator has wrongfully approved said claim, and declines to defend. They make substantially the same allegations as to the claim of Andrew as the others make against the claim of Lewis. As we understand the record, both Lewis and Andrew filed claims against the estate, but the claim of Lewis is the one tried and now presented for review. There is a long record, and we shall not attempt to go into details. We shall attempt to give some of the circumstances which, though some of them may be contradicted, thus making a conflict, show that the case should have been submitted to the jury. The question is as to the sufficiency of the evidence for that purpose, and whether the family relation existed; whether there was an express agreement to pay; whether deceased expected to compensate plaintiff; and whether plaintiff expected pay. There seems to be little dispute between counsel as to the law of the case. Appellee claims that, where it is shown that the person rendering the service is a member of the family and is receiving support therein, a presumption of law arises that such services were gratuitous (citing *Scully v. Scully's Exr.*, 28 Iowa 548, *Donovan v. Driscoll*, 116 Iowa 339, *In re Estate of Squire*, 168 Iowa 597, 604, and *Snyder v. Nixon*, 188 Iowa 779); that the presumption of gratuitous services cannot be overcome, except by reasonably clear and satisfactory evidence (*Donovan v. Driscoll*, supra); that the presumption is not overcome by a showing of the value of the services, or of statements by deceased that the services were valuable (*Donovan v. Driscoll*, supra, *Farmer v. Underwood*, 164 Iowa 587, *Traver v. Shiner*, 65 Iowa 57, *Cowell v. Roberts*, 79 Mo. 218).

On the other hand, appellant says that the testimony warranted a finding by the jury that the services were rendered by claimant with the intention of charging for them, and were accepted by deceased with the intention of paying therefor. They contend that mutual expectation may be shown by circumstantial evidence, as well as by direct (citing *Snyder v. Nixon*, supra, *Sheldon v. Thornburg*, 153 Iowa 622, *In re Estate of Oldfield*,

175 Iowa 118, *Feltes v. Tobin,* 187 Iowa 11, *Wainright Trust Co. v. Kinder,* [Ind.] 120 N. E. 419) ; that it is sufficient if the facts fairly show mutual expectation of payment (*Reeso v. Lehan,* 96 Iowa 45) ; that the character and extent of the services and the circumstances under which they are rendered may be such as to exclude the idea of gratuity (*Sheldon v. Thornburg,* supra) ; that the presumption only applies where the services are such as might ordinarily be expected to be rendered by one member of a family to another (*Snyder v. Nixon,* supra) ; that it is not necessary that deceased should have known that plaintiff expected payment; that it is sufficient if, as a reasonably prudent person, she would have known it (*Spencer v. Spencer,* 181 Mass. 473) ; that any testimony warranting the inference that the services were not gratuitous, but were rendered by plaintiff with the intention of charging for them, and with the justifiable expectation of being paid for them, and that they were accepted with the knowledge, actual or constructive, of this expectation, is sufficient to authorize a recovery (*Hodge v. Hodge,* 47 Wash. 196 [11 L. R. A. (N. S.) 873, 901 and note]).

Appellant claims that, during the last 15 years of the mother's life, claimant devoted himself entirely to her care, in caring for her interests, and that he gave up his own independent farming during that 15 years, which circumstance strongly imports an inference of mutual expectation of payment; and that the services were so extraordinary as to compel the inference that the parties must have had a mutual expectation of payment; that, where a son or daughter has left home, and returned when the parents are no longer able to care for themselves, it affords a strong circumstance in support of mutual expectation of payment. *Marietta v. Marietta,* 90 Iowa 201.

We said, in *McGarvy v. Roods,* 73 Iowa 363, 366, that, where the family relation exists, a promise to pay cannot be implied because the services were performed by one and accepted by the other, as would be the case if such relation did not exist; but that the claimant must go a step further, and establish that there was an expectation by both parties that compensation should be paid; and that it is not essential that the amount of the compensation should be agreed upon. This, we take it, is upon the theory that, the above facts being established, the law im-

plies that reasonable compensation shall be paid. See, also, *Ogden v. Keerl,* 152 Iowa 106.

We shall not review the cases, but proceed to the general history of the case and the parties, and a brief summary of the evidence of claimant bearing upon the questions presented. As to some of the facts, there is no dispute. There is a conflict at other points. It is conceded by appellant that the evidence does not show an express agreement that he should be paid for his services, and it cannot, we think, be justly claimed that he was not a member of the family at the time the services claimed for were performed. The evidence tends to show that deceased died intestate about December 13 or 14, 1915, at the age of about 78 years; that she died as the result of a stroke of apoplexy. Claimant is about 65 years of age. He never married. At the time of his father's death, in 1881, he was about 26 years old; Andrew was 17; there were two other brothers between; and the mothers of interveners were then about 9 and 7 years of age. They died 17 or 18 years before the trial. The father died intestate in 1881, leaving the mother and six children, and an 80-acre farm, about one third of it, under cultivation. Part of the land was wet and swampy. The mother and children continued to live on the farm as a family until her death, except as, one by one, they married, or established homes elsewhere. At the time of his mother's death, and for several years prior thereto, only she and plaintiff of the family were left. The 80-acre farm was not partitioned until after the mother's death. Though the 80 acres belonged to the father, none of the heirs disturbed the mother's possession, and it does not appear that she paid rent to the heirs for the use of their undivided interests. There was no administration upon the father's estate, which was small. The property on hand and the crops were disposed of, from time to time, and, after a few years, the mortgage on the land was paid off, and the place improved with barns, etc. Plaintiff and some of the other boys had worked away from home for some years before the father's death, and at that date, plaintiff and one of the others had become the owners of a 160-acre farm and a threshing outfit, both of which they continued to operate for some years. Andrew continued to live at home about 16

years after the father died, and then married, in 1898. During this 16 years, he did some work on the farm with plaintiff, and attended to his other work away from home. After Andrew married, he moved away from the place, but continued to do some work at home, about 60 days in each year thereafter, in collecting money for his mother, making deposits, and attending to some other business for her. For such services he has filed a claim against his mother's estate. The daughters married and moved away, some 16 or 17 years after the father's death. Plaintiff sold his share in the 160-acre farm and bought 120 acres, which he farmed for about two years, in connection with his work on the home place, living at home with his mother. The years he did not farm the 120, he rented it out. Plaintiff and Andrew were interested in another farm. They farmed their own land and other land together; they both kept horses in the barn on the home place, and some cows; used the pasture for some of the time; fed grain to the horses which had been raised on the home place. Some of the hogs raised at home were butchered and used for meat for the family. The cream and butter were sold, and the proceeds used in buying groceries. Surplus grain and cattle were sold by Andrew, who says he deposited all the proceeds to his mother's credit, and that such deposits now composed her estate, except such sums as he had given his mother from time to time, at her request. Her personal estate, at the time of her death, amounted to $5,794.16 in certificates of deposit, and about 800 bushels of oats. During the time Andrew was at home, he and plaintiff assisted in the house. A part of the time when plaintiff and the mother were living alone, he made his own bed and assisted her in making hers, and assisted in the housework. The mother did what she was able to do. Plaintiff was a strong man and a good worker. One of the witnesses says that he could and did do the work of a man and a half. He prospered in his individual operations.. After the death of the mother, the home 80 was partitioned, and plaintiff purchased it from the referee, and assumed a drainage assessment of $3,200. He did not acquire an education. The financial part was carried on, at least for a part of the time, more by Andrew than by plaintiff. Plaintiff was always at home with his mother, except when his work away from home prevented,

and, according to some of the witnesses, he seldom, if ever, left her alone, night or day. There is evidence that he gave up the operation of his own land in order to be with his mother and to care for her. The children were all good workers. One of them was in poor health for several years before his death, and in 1881, he died of tuberculosis. It is conceded by appellant that all of the children showed affection for the mother when she was sick; they all visited her; and they, with their wives and daughters, helped to take care of the old lady on such occasions. The mother called on Andrew for money whenever she wanted it, and it is probable that, during most of the time, she had means to pay for whatever assistance she needed. At one time, plaintiff and Andrew borrowed money from her to use in buying land, and afterwards paid it back to her, with interest. It is contended by appellant, and his evidence tends to show, that, during the last 17 years of his mother's life, and while her health was very poor, he lived alone with her, and, except during occasional times when they had a hired girl, he did much of the housework, and, with some assistance from other members of the family who resided in the neighborhood, he took care of her in sickness; that, with some assistance from Andrew, he made practically her entire personal estate. Appellees concede that at least some of the money and personal estate left by deceased was the proceeds of the produce of the farm, resulting largely from the labor of claimant and his brother while they lived in the home with the mother, as the head of the family; but it is said that, while they were thus building up this personal estate, she was doing housework for them, got their meals, made their beds, gathered eggs, etc. Andrew's health broke down in about 1900, and he lived in town during the last 12 years, or such a matter, and was on the place only occasionally. After 1900, plaintiff devoted himself almost entirely to caring for his mother and farming the home place. He rented out some of this land, a part of the time after 1900, because his mother's condition of health was such as to require his personal attendance upon her. Other years, when her health was better, he farmed it himself. From the time of the death of the father until the mother's death, the proceeds of the crops sold and of live stock sold from the home farm were turned over to the mother.

Plaintiff's evidence tends to show that the mother was a frail woman, and that, a few years after her husband's death, she developed heart trouble, though some of the witnesses thought later that it was cancer of the stomach, or something of that kind; that this trouble made her subject to spells in which she would become unconscious; that, after regaining consciousness after each attack, she would be bedfast for weeks. She sprained her ankle at one time, and at another broke some ribs, and in 1909 she broke her leg. The fracture of the limb never healed properly, and from that time until her death, she was never able to walk without the assistance of a crutch or cane. She sometimes used a chair for a crutch. A part of the time they kept a hired girl. They had several of them, but none stayed longer than a few weeks. One witness puts it that, after she broke her limb in 1909, up to the time of her death, they had a hired girl about one fourth of the time. Aside from the small amount of personal property left by her husband, the mother never received any property from any source except from the sale of products from the home 80. Out of this the household expenses, doctors' bills, etc., were paid, the mortgage of $500 on the farm was paid off, and in a few years, deceased began to accumulate a surplus, which Andrew deposited. This surplus grew, as the products were sold, from year to year, and the interest added to the principal, until, at the time of her death, she had on hand the amount before stated. All this, except whatever the interest on deposits amounted to, came from the work of plaintiff and such assistance as he received from Andrew. At times, deceased complained of being lonesome. The neighbors visited her frequently; but, for 15 years or more before her death, she was too weak, according to appellant's testimony, to leave home much, and after she broke her leg, she was practically confined to her house and yard. Appellees offered testimony tending to show that the mother's health was better, during later years, than appellant's witnesses put it, and that she was able to do considerable work. Two or three of plaintiff's brothers testified in his behalf, and they, with others, gave evidence tending to show that plaintiff's services were worth as much as or more than the amount claimed for. Deceased seems not to have been inclined to talk much about her business affairs, but to the pastor

of her church, Mr. Barton, she expressed great appreciation for what Lewis had done. He says:

"I am a Methodist preacher; was in charge of the church at Sheldahl twice, first in the fall of 1903; stayed there three years; knew deceased; she was a member of my church; got acquainted with her a month or two after I went there. She was then able to get around the house a little, but not outside. She was at church twice in three years. I was at her house during the first period of my pastorate. The first time, she could get around fairly well. She walked with difficulty; told me she could not often come out; said her health would not permit her to come. Second pastorate began in 1913. Deceased was more feeble; did not get to church during my second pastorate. She was one of the oldest members of the church at Sheldahl. She had broken her leg, which made it worse for her. Had three different talks with her concerning her business affairs, during the second pastorate. I stated to her that, in her feeble condition, she ought to get some woman to take care of her household work, and relieve her. Then she told me again, three times about the same, that Lewis would do for her more than any girls; that she would not have a girl around the house, because Lewis would do the work: and at the end of it, she said about this way, 'Will have to see that he is paid for it.' She said that on three occasions; that he helped her so she didn't need to do any hard work. She said that Lewis had sacrificed what the other children had in their homes, and how much she thought of him for that; that he gave up his chance of going out and establishing anything for himself, because he stayed right home and worked for her. Some of her friends thought it would be advisable for me to talk to her about her getting someone to do her work. The ladies of the church told me she was so feeble that I ought to suggest it to her, and I did so. That was in the forepart of October, 1913. She stated, 'We will have to see he is paid for it.' She was an intelligent woman, talked fairly good English, but would rather talk in Swedish, and we did, all the time. I did not hear her talking with her own children in English; she did with other people."

A neighbor, Mrs. Neuman, says she went over to the Soderlands about once a month.

"Deceased never came over to our house very often, because she was always poorly, and was not able to walk that far. During the past 28 years, she has been in poor health; she had sick spells every once in a while. Before Andrew got married, he and Lewis operated the farm, and after that, Lewis did it. She always spoke of the work Lewis did, and said she thought he ought to have the biggest part of the property. She said he ought to be rewarded, and thought he would be rewarded for all the good he had done for her. Think that was after she broke her leg. Lewis was always working around there when I saw him; saw him scrubbing, churning, and washing, and all the housework. She said that, if it had not been for Lewis, she didn't think she would have existed on that farm; that it was him that kept her, and kept her farm up, and helped her through. She said she felt that he ought to be rewarded. She worked whenever she was able."

It is true enough, as contended by appellee, and conceded by appellant, that the declarations of deceased just referred to, standing alone, would not be sufficient. Appellee relies strongly on *Donovan v. Driscoll*, supra, in which case there are two or three similar declarations, and the court said that this constituted the entire evidence in support of the proposition that the father ever agreed or expected to pay plaintiff wages, etc. It was held that it was not sufficient. In that case, too, there was a will, making provision for the claimant, and the court said that it was not inconsistent to say that payment for services were so made. In the *Squire* case, supra, also relied upon by appellees, the claimant admitted that she had no intention of charging for her services, until after the death of decedent. It is often difficult to put one's finger on one particular circumstance, and say that such is, of itself, sufficient. All the circumstances must be considered. In so considering the matter, we are convinced that the evidence was sufficient to take the case to the jury, and for the jury to say whether or not plaintiff was entitled to recover in some amount, after taking into consideration the greater service by plaintiff in the later years, the assistance rendered deceased by others, and all other circumstances, and to make allowances therefor. We are not determining whether he shall recover, nor in what amount. We are not unmindful of the fact

that frequently trumped-up claims are made against estates. On the other hand, there are just claims wherein the claimant is handicapped by the difficulty in making proof. Each case must be governed by its own facts. Plaintiff could not, under the statute as to personal transactions with deceased, testify that there was an agreement for payment, nor what it was; but we think the testimony warranted a finding by the jury, from all the circumstances, that the services were rendered by claimant with the intention of charging for them, and were accepted by deceased with the intention of paying for them.

It is doubtless true, as we understand appellees to contend, that the presumption that service rendered as a member of the family is gratuitous, is based upon reciprocal duties and service from one to the other. Ordinarily, a father and son, or a mother and son or daughter, working together in a common enterprise, each able physically to be of service to the other, would not expect pay. The duties and service of each would be reciprocal, under such circumstances. Of course, the service rendered by each may not be exactly equal. Allowance must be made for the willingness of either to help the other, because of affection, and because of the duty naturally due from one to the other. On the other hand, suppose the service rendered by one to the other is greatly disproportionate. As an extreme illustration, suppose one is strong, healthy, willing, and renders substantially all the service, while the other is old, feeble, crippled, and unable to render any, or but little, service. Could it be justly said that the duties and service were reciprocal, even though there was affection and a duty because thereof? It seems to us that it cannot be said, as a matter of law, that it was reciprocal. Though, as said, plaintiff prospered in his outside enterprises, when he was able to devote his time thereto, it is almost inconceivable that he would give up his own chances and his own business, to a large extent, as the evidence tends to show he did, for a considerable part of the time at least, and devote his time to the care of his mother, and substantially create and build up the estate left by her, for the benefit of her other heirs, without any expectation on his part of compensation other than his board, and such other benefits, if any, as the evidence shows he received. Taking these and all other circumstances in the case,

is it a reasonable inference, upon which reasonable minds might not differ, that he would do so, or that deceased should not intend and expect to make compensation? In the instant case, deceased was, for a part of the time at least, practically helpless. She needed someone to care for her, and for her business. The evidence of Mr. Barton and Mrs. Neuman, with the other circumstances, tends to show that deceased intended and expected to pay plaintiff. Plaintiff left his own business to care for her, to a considerable extent at least. He also, to a considerable extent, created and built up the estate left by her. These and the other circumstances which will not be now repeated were sufficient, we think, to take the case to the jury. Doubtless plaintiff's service was greater in the later years, and he would be entitled to greater compensation. But these are all matters for the jury, in fixing the amount of plaintiff's allowance, if the jury allows him anything.

2. Appellees' plea of the statute of limitations as to so much of the services as were rendered prior to five years before action was brought, is not seriously argued. Though, as said, the services may have been less in earlier years, there appears to have been no hiatus in the account. Since it is a continuous account, there is no bar. *Wendeling v. Besser*, 31 Iowa 248; 1 A. L. R. 1063 and note; *Moser v. Crooks*, 32 Iowa 172; *Kilbourn v. Anderson*, 77 Iowa 501, 502; *Cedar County v. Sager*, 90 Iowa 11.

2. LIMITATION OF ACTIONS: long continued and unbroken services.

3. It is thought by appellant that, because interveners, in one division of their plea, set up that deceased had paid plaintiff, this is an implied admission that there was an agreement to pay; that, though the statute allows inconsistent defenses, a defendant may not admit sufficient facts in one division of his answer to warrant judgment for the plaintiff, and at the same time claim the benefit of a denial in another division (citing cases). Appellees respond that they had a right to plead inconsistent matters. Plaintiff did not introduce that part of the pleading in evidence, or offer to. Whether he had a right to do so, we do not determine, for the reasons which will be stated in a moment. It is doubtful whether appellant's position at this point can be sustained; but, since we hold the evidence sufficient

to take the case to the jury without this, we deem it unnecessary to discuss the proposition, which is argued at some length by both.

4.   It is argued by appellees that the other children, plaintiff, and the mother, were cotenants, or tenants in common, and that they were all engaged in the farming enterprise as a partnership, and that the remedy for a division of the proceeds is by accounting; that they were all operating their own farm; and that, therefore, the relation of master and servant between them can only be created by an express agreement.   This matter was not raised by any pleading filed by interveners in the district court, and no accounting was asked by either party.   We have said that the heirs seem to have permitted the mother to occupy the premises without objection.   Towards the last, only deceased and plaintiff lived on the land.   We have held that it was necessary for plaintiff to show that there was an agreement, to the extent that the services were rendered with the expectation on the part of both that compensation should be paid.   Possibly the fact that the parties occupied the premises together, as shown, would be a circumstance bearing on the question as to whether the family relation existed between plaintiff and deceased, and as to whether compensation was to be paid.   But, under the circumstances, we do not feel called upon to determine this point.

For the reasons given, the cause is—*Reversed and remanded.*

Evans, C. J., Weaver and DeGraff, JJ., concur.