Karl GABELMANN, Appellant,

v.

NFO, INC., Appellee.

No. 96–161.

Supreme Court of Iowa.

Nov. 26, 1997.

Stephen N. Greenleaf of Lynch, Greenleaf & Michael, L.L.P., Iowa City, for appellant.

Gayla R. Harrison of Johnson, Hester, Walter & Harrison, L.L.P., Ottumwa, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, LAVORATO, and SNELL, JJ.

LAVORATO, Justice.

This lawsuit by a former employee against his former employer comes to us on further review. The employee appealed, challenging two district court rulings. In the first ruling, the district court sustained the employer's motion for directed verdict on the employee's Iowa Code chapter 91A claim for wages in the form of a monthly allowance. The court concluded the housing allowance was not wages. In the second ruling, the court granted the employer's motion for judgment notwithstanding the verdict on the employee's breach of contract claim for the housing allowance. The court did so on two grounds: There was a lack of substantial evidence to support the claim, and the claim was time-barred. The court of appeals affirmed the ruling on the motion for judgment notwithstanding the verdict, concluding the claim was time-barred.

We conclude (1) the housing allowance is "wages" for purposes of chapter 91A, (2) there was substantial evidence to support the breach of contract claim, and (3) only a portion of the housing allowance is time-barred. We therefore vacate the court of appeals decision, reverse the district court's two rulings, and remand with directions.

## I. *Facts.*

NFO, Inc. is a nonprofit corporation based in Ames, Iowa. It is a membership organization that provides marketing services and information to its farmer members.

Karl Gabelmann was a long-time employee of NFO. He began working for NFO in 1973 out of his home in Garner, Iowa, when the organization was based in Corning, Iowa. He signed an offer of employment at the time which stated his position, salary, travel allowances, and lodging expenses. Brynolf Grahn was Gabelmann's direct supervisor. Grahn was director of field operations for NFO and worked out of the organization's headquarters in Corning.

Over time, Gabelmann's responsibilities with NFO grew and he was required to move to Spencer, Iowa. Gabelmann asked Grahn if NFO would pay for the move. Grahn told Gabelmann that the NFO would not pay for the first move, but it would pay for subsequent moves.

In May 1975 Grahn sought to bring Gabelmann to the Corning offices to work with him. Grahn obtained permission from NFO's president, Oren Lee Staley, to do so and to pay Gabelmann's moving expenses and an $80 per month housing allowance. Grahn then contacted Gabelmann on a Friday night and requested Gabelmann to move to Corning. Grahn told Gabelmann that he would receive moving expenses and an $80 per month housing allowance.

Gabelmann accepted Grahn's offer and began working in Corning the following Monday morning. Gabelmann's family remained in Spencer until his son finished high school. Gabelmann lived in a motel in Corning during the week and traveled to Spencer on weekends. Gabelmann's family moved to Corning the following May.

During this year's time, NFO paid Gabelmann his motel, food, and automobile expenses. In the fall of 1975, Grahn left NFO to return to farming in Minnesota. Roger Slottach succeeded Grahn as director of field operations. Before leaving, Grahn told Slottach of the commitment to pay Gabelmann's moving expenses and housing allowance. Grahn left it to Slottach to complete the necessary internal paperwork to carry out this commitment.

Shortly after Gabelmann's family moved to Corning, Gabelmann gave Slottach the information to prepare the requisition forms that NFO used to process requests for moving expenses and housing allowances. Slottach prepared one for the moving expense which amounted to $689.01 and one for the $80 per month housing allowance. Slottach approved both requests as did Gene Potter, the association's budget and finance director.

Such requisition requests were passed on to Staley, the president, for his approval or rejection. Staley's usual custom was to indicate approval or rejection by initialing the lower left-hand corner of the form. When Slottach submitted the requisitions to Staley, he fully expected them to be approved.

For some reason, the original requisitions for the moving expenses and housing allowance never turned up, only copies remain. Staley's initials do not appear on the copies. Thus there is no record evidence that Staley ever rejected or approved the requests on the original requisition forms. Notwithstanding the requisition procedure, Grahn gave the following testimony at trial on how he usually obtained Staley's approval:

Q. What was your practice, if you had one, in terms of making requests for changes in personnel assignment, salaries, reimbursements? Did you have a regular way of handling those issues within the organization? A. Yes. My method was always to go with figures and reasons and arguments to Mr. Staley on why [a salary] should be raised or why I wanted a certain individual. And if he says okay, go ahead, make out a requisition and send it to me, that's what I would do, but I always went to Mr. Staley first and got his consensus on it and then I would go ahead and

complete the requisition if the person agreed with me that I would make a requisition with, of course.

Q. So if I understand correctly, the paper followed the decision and not the other way around? A. Absolutely, right.

Grahn further testified he followed this procedure in obtaining Staley's approval to offer Gabelmann moving expenses and a housing allowance. Grahn did not immediately follow up with requisition requests for these items because Gabelmann's family was not yet ready to move to Corning and had not done so by the time Grahn left the association in the fall of 1975.

Several times, Gabelmann asked Slottach about the status of the two requisitions. Slottach said he would inquire, but never gave Gabelmann an answer. Meanwhile, Grahn returned to NFO later in 1976, and Gabelmann asked him about the payments. Grahn said he would look into it, but, like Slottach, never gave Gabelmann an answer.

Thereafter NFO experienced financial problems that persisted through most of Gabelmann's remaining employment. At times Gabelmann would have to borrow money because the association could not afford to pay his salary.

By 1982, Devon Woodlund had replaced Staley as president. Grahn, who had again left NFO, returned as director of budget and finance. At this time, Gabelmann wrote Grahn a note asking again about his moving expenses and housing allowance. Grahn told Gabelmann he could not authorize payment at that time because NFO was financially strapped; the organization had resorted to four-day work weeks and a salary freeze. Valuing his job more than the funds he felt he was owed, Gabelmann did not press the matter.

By May of 1986, Grahn had left NFO again. Rene Niese succeeded Grahn as director of budget and financing. At about this time, Gabelmann filed a requisition form, asking for $689.01 moving expenses and $10,640 accrued housing allowance. NFO took no action.

In June 1993, NFO dismissed Gabelmann, telling him that they had to cut back and he was old enough to retire anyway. Shortly after, Gabelmann made a written demand on NFO for the moving expenses and housing allowance. The total demand, including 8.5% interest, amounted to $40,339.69. When NFO refused to pay, Gabelmann sued.

## II. *Proceedings.*

Gabelmann filed this action on March 21, 1994 for breach of contract and for wages under Iowa Code chapter 91A. He asked for the moving expenses and accrued housing allowance. NFO filed a denial and an affirmative defense based on the statute of limitations.

At trial the jury heard testimony from, among others, Gabelmann, Grahn, Slottach, and Staley's administrative assistant, Gene Potter. The jury also saw examples of completed requisition forms and heard testimony about the requisition process.

NFO moved for directed verdict at the conclusion of Gabelmann's case, arguing that there had been no "meeting of the minds," principally because the requisition process showed no approval by Staley. NFO also argued that Gabelmann had failed to establish a chapter 91A claim and that in any event the statute of limitations barred Gabelmann's claims. The district court granted the motion on the chapter 91A claim but denied it on the contract and statute of limitations issues.

NFO renewed its directed verdict motion at the close of all the evidence. The court again overruled the motion on the contract and statute of limitations issues and submitted the case to the jury on the contract claim. The court gave the jury no instructions on the statute of limitations issues. The jury awarded Gabelmann $22,000.

Thereafter, NFO moved for a new trial, for judgment notwithstanding the verdict, and remittitur.

The district court granted NFO's motion for judgment notwithstanding the verdict. The court determined Staley was the only NFO employee with authority to (1) approve and make payment for moving expenses and housing allowances and (2) enter into any

contract. Because no record evidence established that Staley had approved any request by Gabelmann for such payment, the court concluded there was no meeting of the minds between Gabelmann and NFO and therefore no basis for an unwritten contract. The court also concluded that the five-year statute of limitations for unwritten contracts had run well "after NFO had the ability to pay."

Gabelmann appealed.

His appeal raises three issues: (1) whether substantial evidence supported the jury's finding of a contract between Gabelmann and NFO that required NFO to pay Gabelmann a housing allowance as part of his compensation; (2) whether the statute of limitations barred Gabelmann's contract claim; and (3) whether Gabelmann is entitled under Iowa Code chapter 91A to recover court costs and attorney fees, as well as the unpaid housing allowance.

We transferred the case to the court of appeals. The court of appeals affirmed, concluding Gabelmann's contract claim was time-barred. The case is now before us on further review.

We note at the outset that Gabelmann makes no claim that he is entitled to moving expenses. We therefore give that claim no further consideration. Iowa R.App. P. 14(f)(3).

### III. *Sufficiency of the Evidence to Support Jury's Finding of a Contract.*

■■■ A. *Scope of review.* Gabelmann challenges the district court's ruling on the motion for judgment notwithstanding the verdict as to this issue. Our rules regarding scope of review on the granting of such a motion are well-settled:

> A judgment notwithstanding the verdict must stand or fall on the grounds stated in the motion for directed verdict. On appeal, our review is limited to those grounds.

> When considering a motion for judgment notwithstanding the verdict, the district court must view the evidence in the light most favorable to the party against whom the motion is directed. In reviewing the propriety of the district court's ruling on

such a motion, we also view the evidence in the same manner. Simply put, we ask, was there sufficient evidence to generate a jury question? These are the same principles that the district court is bound to follow on a motion for a directed verdict.

> Under this view of the evidence, if there is substantial evidence to support the claim or defense, the motion for directed verdict or judgment notwithstanding the verdict should be denied. Conversely, without such evidence, a directed verdict or judgment notwithstanding the verdict is appropriate. Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion.

*Johnson v. Dodgen,* 451 N.W.2d 168, 171 (Iowa 1990) (citations omitted).

B. *Meeting of the minds.* The jury found a contract existed for a housing allowance. The district court granted a judgment notwithstanding the verdict. The court concluded there was no substantial evidence that there was a meeting of the minds between Gabelmann and NFO to establish an unwritten contract for the housing allowance. The rationale for the ruling was that Staley was the only person who had authority to approve and make payment of such an allowance. Because there was no evidence of such an approval, the court concluded there was no contract. NFO raised these grounds in its motions for directed verdict so the issue is before us.

Gabelmann takes issue with the district court's rationale, a rationale NFO relies on in this appeal. Gabelmann points out that NFO is a corporation, which can only act through its agents. Gabelmann contends Grahn, in his capacity as department head of NFO's field staff, was NFO's agent. As agent, Grahn had authority to bind NFO, his principal, if his acts were within the scope of his actual or apparent authority. Gabelmann argues that the evidence is substantial to establish that Grahn had such actual authority and did bind NFO to pay the housing allowance. For reasons that follow, we agree.

■■■ 1. *Actual authority.* NFO is a corporation and as such can only act through its agents and employees. *Kerrigan v. Errett,*

256 N.W.2d 394, 396 (Iowa 1977). No one contends that Grahn was not an agent or employee of NFO. Rather the issue is whether Grahn—as an agent—could have obligated NFO—his principal—to pay the housing allowance. Such an issue implicates the law of agency.

 A basic element of agency law is that whatever an agent does, within the scope of the agent's actual authority, binds the agent's principal. *Dillon v. City of Davenport*, 366 N.W.2d 918, 924 (Iowa 1985). According to *Dillon*,

> [a]ctual authority to act is created when a principal intentionally confers authority on the agent either by writing or through other conduct which, reasonably interpreted, allows the agent to believe that he has the power to act. Actual authority includes both express and implied authority. Express authority is derived from specific instructions by the principal in setting out duties, while implied authority is actual authority circumstantially proved.

*Id.* (citations omitted).

 Under these rules, the question is whether NFO, through Staley's conduct and statements, led Grahn to reasonably believe he had the authority to offer Gabelmann a housing allowance. Viewing the evidence in the light most favorable to Gabelmann, we believe the answer to this question is yes.

Substantial record evidence shows that Grahn had express actual authority to offer Gabelmann an $80 per month housing allowance. Grahn testified that Staley told him to make such an offer. Based on this direction from Staley and prior history between the two men, the jury could find that Grahn reasonably believed he had express authority to make the offer, acceptance of which would bind NFO. Reduced to its core, Staley's offer through Grahn (and Gabelmann's acceptance) formed the contract. *See Magnusson Agency v. Public Entity Nat'l Co.*, 560 N.W.2d 20, 28 (Iowa 1997) (holding to enforce a contract evidence must show a mutual intent to be bound to an offer "certain as to its terms and requirements"). From Grahn's testimony the jury could also find that the decision to make the offer preceded the paperwork, not

the other way around. The requisition process merely formed the means to perform or breach the contract. Staley, on behalf of NFO, was obligated to approve the requisition once made.

It is true that the jury heard extensive testimony regarding the requisition process—probably designed to show that NFO had agreed merely to entertain a request for the housing allowance. Admittedly, substantial evidence supports this theory, and the district court apparently thought so too. However, as between two factual propositions, each supported by substantial evidence, the one the jury chooses stands.

### IV. *Statute of limitations.*

The district court did not submit the statute of limitations issue to the jury. Rather in its ruling on NFO's motion for judgment notwithstanding the verdict, the court ruled on the issue as a matter of law. The court applied the five-year statute of limitations for unwritten contracts. Iowa Code § 614.1(4) (1993). The court held that the statute began to run when Gabelmann knew NFO had the ability to pay, which was more than five years before Gabelmann brought his suit. For this reason, the court held as a matter of law that Gabelmann's claim was time-barred.

Gabelmann contends that Iowa Code section 614.5 governs his housing allowance claim. This provision provides that "when there is a continuous, open, current account, the cause of action shall be deemed to have accrued on the date of the last item therein, as provided on the trial." *Id.* § 614.5. Gabelmann concedes that the housing allowance was to be paid on a monthly basis. But, he argues, because he did not in fact receive it on a monthly basis, due to NFO's dire financial condition, the date on which the housing allowance was actually to be paid became indefinite. Gabelmann concludes from this that the obligation for the housing allowance became due on the date the account was closed—the date NFO terminated his employment.

NFO contends the housing allowance is not a continuous, open, current account but rather an unwritten contract. NFO points out that under Iowa Code section 614.1—the

general statute of limitations provision—actions must be brought within a certain period of time after the cause accrues. NFO argues that an action for breach of contract accrues when the contract is breached. Because Gabelmann expected to be paid monthly beginning in May 1976, the breach of contract occurred then. For that reason the five-year statute of limitations for unwritten contracts began to run in May 1976.

If the housing allowance is considered to be wages, as Gabelmann claims for chapter 91A purposes, NFO similarly argues a cause of action for wages accrues when the wages become due and payable. Because Gabelmann expected to start receiving the housing allowance in May 1976, NFO asserts the cause of action accrued when the housing allowance was not paid at that time. For that reason, NFO argues, the two-year statute of limitation for wages under Iowa Code section 614.1(8) began to run in May 1976.

Thus, NFO concludes, under either statute of limitation provision—unwritten contract or wages—Gabelmann's housing allowance claim was barred since he did not file suit until March 21, 1994, eighteen years after the claim for the housing allowance accrued.

NFO has a fall-back position to counter Gabelmann's contention that the housing allowance is a continuous, open, current account. NFO takes the position the district court took: The statute of limitations began to run when NFO was objectively able to pay. NFO contends the evidence shows that in 1988 it was flush with money from a lawsuit and could have paid the allowance at that time, a fact that Gabelmann knew. Because Gabelmann did not file suit until 1994—some six years later—the suit was barred under any of the statute of limitations provisions mentioned.

■ In answer to the various contentions of the parties, we think the statute of limitations for "wages" applies. Iowa Code § 614.1(8). This provision provides that actions "founded on claims for wages" must be brought within two years or they are barred. *Id.* "Wages" are defined as "money that is paid or received for work or services, as by the hour, day, or week." Webster's Encyclopedic Unabridged Dictionary 2136 (Deluxe ed.1996). We think that a "housing allowance" to be paid on a monthly basis and negotiated as part of a salary package, fits the definition of "wages."

■ The two-year statute of limitations for wages commences as each payment comes due. *Halverson v. Lincoln Commodities, Inc.,* 297 N.W.2d 518, 521 (Iowa 1980). Thus, an employee may recover only so many payments as are within two years of when the petition is filed. *Id.*

■ The evidence is undisputed that Grahn offered Gabelmann a housing allowance of $80 *per month.* Contrary to Gabelmann's contention, NFO's failure to make the monthly housing allowance payments did not change this agreed-upon periodic payment. Rather such failure constituted a breach of the employment agreement as to each payment coming due. A cause of action therefore accrued for each payment as it became due, and the two-year statute of limitations began to run for that payment. Under *Halverson,* Gabelmann may recover only so many payments as are within two years of March 21, 1994, the date the petition was filed.

Gabelmann relies heavily on *Patterson v. Patterson,* 189 N.W.2d 601 (Iowa 1971); *Soderland v. Graeber,* 190 Iowa 765, 180 N.W. 745 (1921); *Scott v. Wilson,* 185 Iowa 464, 170 N.W. 761 (1919); *Sullenbarger v. Ahrens,* 168 Iowa 288, 150 N.W. 71 (1914); *In re Oldfield's Estate,* 158 Iowa 98, 138 N.W. 846 (1912); and *Kilbourne v. Anderson,* 77 Iowa 501, 42 N.W. 431 (1889). His reliance is misplaced. Those cases stand for the proposition that when services are rendered for a long, continuous period of time, under an implied agreement for compensation, but *wholly indefinite as to the period of employment,* the statute of limitations does not begin to run until there is a break in, or an end to, the services. *Patterson,* 189 N.W.2d at 605; *Soderland,* 190 Iowa at 776, 180 N.W. at 749–50; *Sullenbarger,* 168 Iowa at 297, 150 N.W. at 74; *Kilbourne,* 77 Iowa at 502, 42 N.W. at 431.

There is one common thread running throughout these cases: Unlike the present

case, there was no agreement to pay a fixed amount per hour, day, week, or month. Thus, there was no basis to say that the payment for services accrued at any time before there was a break in, or an end to, the services. Once there was a break in the services or the services ended—be it months or even years after the services started—payment accrued thereby triggering the statute of limitations. *See Patterson,* 189 N.W.2d at 605 (holding that two-year statute of limitations for wages did not begin to run until two years *after* nursing services ended even though claim was for services performed over a three year period; "[t]he services" were part of a "continuous account" and "[t]here was no break in the rendition of these services which would cause the statutory time to begin to run").

■■ Turning to NFO's fall-back position, we are aware that some jurisdictions read an "ability to pay" rule into their statute of limitations statute. *See In re Clover's Estate,* 171 Kan. 697, 237 P.2d 391, 392 (1951) (holding that the statute of limitations on a promise to pay begins to run when the promisor's ability to pay actually becomes a fact). We reject any notion that our statute of limitations provisions should similarly encompass an "ability to pay" rule as the district court implied and as NFO argues here. We decline the invitation to read into the statute anything more than it already says.

## V. *The Chapter 91A Claim.*

The district court directed a verdict in favor of NFO on Gabelmann's Iowa Code chapter 91A claim. The court stated: "No evidence given its best light would establish that any of the claims Mr. Gabelmann has here would be considered wage claims pursuant to that statute, so the court grants the directed verdict as to the 91A claim."

Gabelmann thinks the housing allowance is "wages" for chapter 91A purposes and for that reason wants us to award him not only the housing allowance, but also court costs and attorney fees.

Not surprising, NFO thinks Gabelmann failed to provide any evidence to establish a claim for wages under chapter 91A.

■■ A. *Scope of review.* Whether the housing allowance constitutes "wages" for purposes of Iowa Code chapter 91A involves statutory interpretation which is a question of law for the court to decide. *Hornby v. State,* 559 N.W.2d 23, 25 (Iowa 1997) (holding that whether long-term disability benefits are "wages" under Iowa Code chapter 91A involves statutory interpretation, a question of law for the court to determine). The district court was therefore deciding a question of law when it directed a verdict in favor of NFO on the chapter 91A claim. Thus, our review is for correction of errors of law as to whether the housing allowance is "wages" for chapter 91A purposes. Iowa R.App. P. 4. In our review we are not bound by the district court's interpretation. *State v. Bond,* 493 N.W.2d 826, 828 (Iowa 1992).

B. *Definition of wages for chapter 91A purposes.* Iowa Code section 91A.2(7)(c) defines "wages" as

compensation owed by an employer for:

. . . .

c. *Any payments to the employee . . . for the benefit of the employee,* including but not limited to payments for medical, health, hospital, welfare, pension, or profit-sharing, *which are due an employee under an agreement with the employer. . . .*

We have recognized that this is a broad definition of wages intended to "facilitate the public policy of allowing employees to collect wages owed to them by their employers." *Hornby,* 559 N.W.2d at 25–26.

■■ Earlier in this opinion, we held that the housing allowance here fits the common meaning of "wages" because it was to be paid on a monthly basis and was negotiated as part of a salary package. For the same reason, we think the housing allowance meets the broad definition of wages in section 91A.1(7). Because it was negotiated as part of a salary package, the housing allowance is "compensation owed by an employer for [a]ny payment[ ] to an employee . . . for the benefit of the employee . . . which [is] due an employee under an agreement with the employer." Iowa Code § 91A.2(7)(c).

C. *Sufficiency of the evidence to submit the chapter 91A claim.* We have already concluded that there was substantial evidence to support the jury's verdict that NFO breached an agreement to pay Gabelmann the housing allowance. The same evidence, of course, dictated submitting the chapter 91A wage claim to the jury. The district court erred in failing to do so.

D. *Request for court costs and attorney fees.* Because the housing allowance is "wages" for purposes of chapter 91A, Gabelmann thinks we should order NFO to pay not only the housing allowance but also court costs and attorney fees pursuant to Iowa Code section 91A.8.

Gabelmann seeks relief under the "other instances" provision of section 91A.8. *See* Iowa Code § 91A.8 (imposing liability on employer who intentionally fails to pay employee wages for the wages not paid, liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages; "[i]n other instances", employer's liability is limited to unpaid wages, court costs and usual and necessary attorney's fees incurred in recovering the unpaid wages); *see also Audus v. Sabre Communications Corp.,* 554 N.W.2d 868, 874–75 (Iowa 1996) (noting the same).

The problem with Gabelmann's request is that there has been no adjudication of the chapter 91A claim in the district court. Until such an adjudication, the district court is without authority to rule on Gabelmann's court costs and attorney fee claims. We are similarly without authority to order the district court to do so. Our authority is limited to reversing the district court's ruling on the 91A claim and remanding for further proceedings consistent with this opinion.

VI. *Disposition.*

The district court erred in granting NFO's motion for judgment notwithstanding the verdict on Gabelmann's breach of contract claim. There was substantial record evidence to support the jury's finding that NFO agreed to pay the housing allowance. We reverse the district court's ruling on this issue.

The district court and the court of appeals erred in holding as a matter of law that the statute of limitations barred all of the breach of contract claim. We conclude Iowa Code section 614.1(8) applies, providing a two-year statute of limitations for wages. Because the statute of limitations began to run on each monthly housing allowance payment as it accrued or came due, Gabelmann is entitled to recover only so many payments as are within two years of March 21, 1994, the date the petition was filed. We vacate the court of appeals decision and reverse the district court's posttrial ruling on this issue and remand for an order reinstating the jury verdict in favor of Gabelmann and against NFO for the amount of payments not barred.

The district court also erred in concluding that the housing allowance did not constitute wages for purposes of the chapter 91A claim. Additionally, there was sufficient evidence to submit the chapter 91A claim to the jury. We reverse the district court's ruling sustaining NFO's motion for directed verdict on this claim. We remand this claim for further proceedings consistent with this opinion.

Until there has been an adjudication of the chapter 91A claim, the district court is without authority to award court costs and attorney fees pursuant to Iowa Code section 91A.8. We are likewise without authority to order the district court to grant such relief.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED; REMANDED WITH DIRECTIONS.**