A. J. CAMPBELL et al., Appellants, v. CENTERVILLE BLOCK COAL COMPANY, Appellee.

**EVIDENCE: Best Evidence—Amount of Coal Mined.** The amount of 1 coal taken from a mine may, in the absence of better evidence, be approximately established by the following items of evidence:
1.  The official maps required by statute. (Sec. 2485, Code Supp., 1913.)
2.  The average thickness of the veins mined.
3.  The area mined.
4.  The proportion of coal left in the mine as pillars, waste, etc.
5.  The weight of a cubic foot of the coal mined.
6.  The manner of removing the coal and accounting therefor.

**MINES AND MINERALS: Disputing Accuracy of Statutory Maps.** The 2 statutory maps required of a mine owner or operator, showing the area mined, while attended by a strong presumption of accuracy, may, on the issue as to the amount of coal mined, be disputed by the owner or operator, and shown to be inaccurate. (Sec. 2485, Code Supp., 1913.)

*Appeal from Appanoose District Court.*—D. M. ANDERSON, Judge.

NOVEMBER 26, 1920.

ACTION to recover royalty on coal alleged to have been removed from plaintiff's land under a lease, resulted in a verdict for plaintiff. Motion for new trial sustained. Plaintiffs appeal.—*Affirmed*.

*H. E. Valentine*, for appellants.

*Howell, Elgin & Howell*, for appellee.

LADD, J.—On the 20th day of March, 1893, A. J. and D. C. Campbell and wives executed to the Raven Coal Company a

lease for a term of 99 years of all the coal underlying about

1. EVIDENCE:        600 acres of land adjacent to Centerville. Among
best evidence:   other conditions, lessee undertook to mine and
amount of coal
mined            remove all the available merchantable coal un-
derlying said land, and to pay lessors a royalty of 4 cents a ton
of 2,000 pounds for each and every ton of merchantable lump
coal taken from under said land, "said royalty to be paid
monthly at said second party's office in Centerville, Iowa, on
the 20th day of each month, for the coal mined during the pre-
ceding month in the following proportions, to wit: 21/31 of the
same payable to said A. J. Campbell, his heirs or assigns, and
10/31 of the same payable to said D. C. Campbell, his heirs or
assigns. And it is further agreed that said second party shall
furnish at the time of payment, to each of said two parties of
the first part, a written statement showing the total amount, in
tons, of coal mined during the preceding month, and the amount
of royalty due each of said parties." Other conditions of the
lease are not involved, and for that reason are not set out. The
lessors allege that defendant became owner by assignment of
all the rights of the Raven Coal Company in and to said lease,
and that, from 1897 to October 9, 1916, it has removed 664,790
tons of the coal underlying said land, but has reported and paid
for only 559,993 tons, leaving a difference of 105,790 tons neither
reported nor paid for; and judgment is prayed for the royalty
of 4 cents a ton on such difference, with interest, or $6,771. By
way of amendment, plaintiff further alleged that, about March
1, 1898, the owners of the stock in the Raven Coal Company
transferred said stock to owners of shares of stock in defendant
company, after which reports and payment of royalties have been
made by defendant until this suit was begun; and plaintiffs
say the defendant thereby held itself out and caused them to
believe that it was assignee of said lease, and that plaintiffs so
dealt with defendant and had the right to assume that defendant
was assignee of the lease, and that it is estopped from asserting
the contrary. The answer put all the allegations of the petition,
other than the execution of the lease, in issue, pleaded the statute
of limitations and laches, and, in effect, that report and payment
amounted to accounts stated, back of which inquiry might not
extend. The cause went to the jury, and a verdict was returned

for the plaintiffs. Thereupon, defendant moved for new trial, on 40 grounds. The motion was sustained on 3 of these, and overruled as to the remaining 37. The three grounds on which the motion was sustained are, in substance, that: (1) The verdict was not supported by a scintilla of evidence; (2) that it was contrary to the great weight of evidence; and (3) that the preponderance of evidence was favorable to defendant. The court, in setting it aside, ruled that ''the verdict is not supported by the weight of evidence, and is against the weight of evidence.'' The record was such that the court might have reached the last of these conclusions, and, if so, it cannot be said that ordering a new trial on that ground was an abuse of discretion. This proposition has been too frequently recognized to require citation of authority for its support, but see *Post v. City of Dubuque*, 158 Iowa 224; *Porter .v. Madrid St. Bank*, 155 Iowa 617.

We might stop here; but, in view of another trial, and the insistence of both parties that we express our views on the sufficiency of the evidence to carry the issues to the jury, we shall briefly review the record. As plaintiffs conceded that they had received royalties, as agreed, upon 559,993 tons of coal, there could be no recovery, unless more than this amount had been mined and removed from beneath the surface of their land,— that is, from the Raven mine,—and they are entitled to recover at the rate of 4 cents a ton on such excess, if any. Our inquiry is limited to ascertaining whether more than the tonnage stated was removed. The plaintiffs sought to prove this by (1) resorting to the map exacted by Section 2485 of the Code, providing that ''the owner or person in charge of any mine shall make or cause to be made an accurate map or plan of the same, on a scale of not less than one hundred feet to the inch, showing all the area mined or excavated, and on or before the first day of September of each year cause to be made a statement and plan of the progress of the working of the mine up to date, which progress shall be clearly indicated upon the map hereinbefore required;'' (2) ascertaining the thickness of the coal vein shown by the map to have been mined out; (3) showing the area mined; (4) showing the proportion of coal left in the mine as pillars and stubs between the doors to the miners' rooms, and on the

surface as screenings, together with that not minable, owing to abnormal conditions; (5) showing the weight of a cubic foot of coal such as mined; and (6) showing the manner of removing the coal and accounting therefor. Such evidence was clearly admissible, and, save the last paragraph, as declared by one engineer and acquiesced in by another, is the only practicable method of ascertaining the amount of coal removed, if the record of the coal removed is not available, or is so defective as not to be reliable. True, such evidence is subject to some infirmities, but, on the whole, affords approximately the measure of the coal taken out. If the area of the coal actually removed is accurately shown on the map, as is required of the owner or other person in control of the mine, and the average thickness is ascertained, together with the actual weight of a cubic foot of coal of average quality, we see no reason for doubting the substantial accuracy of the computation therefrom. The difficulty is in ascertaining such information with substantial accuracy.

I. Hall, after qualifying as an expert, testified to having ascertained the weight of a cubic foot of coal by placing a chunk thereof in a bucket of water, weighing the water displaced thereby, as well as the chunk of coal; and, of course, the weight of the chunk of coal would be the same proportion of a cubic foot thereof as the weight of the water displaced would bear to 62½ pounds, the weight of a cubic foot of water. In this way, he reached the conclusion that a cubic foot of coal weighed 82.96 pounds. If an average chunk of coal were used, and none of the water clung to the coal, and none were lost by evaporation or in the process of displacing and collecting, this method would seem conclusive. One of the state mine inspectors swore that the weight of a cubic foot of bituminous coal, generally accepted, is 80 pounds. An operator of long mining experience swore to having weighed a cubic foot of such coal, and to having found the actual weight to be 68 pounds and 13 ounces. This evidence, without more, carried the issue as to the weight of a cubic foot of coal, to the jury.

II. There was only a slight difference in the computation of the area mined, as shown by the map,—less than an acre; but defendant adduced evidence tending to impeach the accuracy of the map. It is not conclusive, though strong evidence of what

it represents, but testimony tending to show that errors had been 2. MINES AND MIN- made, and that portions represented on the map ERALS: disputing as having been mined were not mined, was ad- accuracy of stat- utory maps.    missible; for, in an action like this, the ulti- mate question is how much lump coal actually has been removed therefrom by the operator. The evidence as to inaccuracies in the map, however, was general, as tending to show conditions prevailing in the mine,—that rooms were not excavated as long or as wide as shown, without indicating the particular room or number of rooms or the difference from the dimensions shown on the map. As the owner or person in charge made the map, or caused it to be made, and it was required to be accurate, and for the use of any person interested, it is to be treated as in the nature of a declaration by defendant, and considered with evidence tending to show conditions prevailing in the mine, and the extent of rooms excavated and shown on the map, as well as of abnormal conditions and pillars reducing the area of coal mined. The evidence might well be more definite. The area of coal mined also was for the jury to determine.

III. Hill swore to having measured the thickness of the vein of coal, or rather, of the depth of the space from which the coal had been removed, and concluded that the average depth was 30 inches. Lodwick measured at 5 places, at 4 of which the depth was 30 inches, and at the other, 31 inches. The mine inspector, without measuring, estimated such depth at from 26 to 28 inches, and Smith, a pit boss for many years, at 29 inches. Others were heard on the subject, but enough has been said to indicate that the issue was for the jury.

IV. The proportion of coal or other material left in the mine, included within the average thickness, was more difficult to ascertain. Hill estimated that the pillars and coal between the doors to the rooms would amount to about one third of the area, and that abnormal conditions would include about 11 acres more. Lodwick thought that at least 44 per cent would be left in the mine, and not to exceed 56 per cent of coal taken, and added that, "on the average room and pillar workings, they do well to get 50 per cent out: that is, finally accepted." This witness added that "the 44 per cent I said was left in, includes the pillars, but doesn't include soft coal, unmerchantable coal,

faults, etc.'' One of the state mine inspectors swore that the proportion removed from the mines in that part of the state varied from 50 to 75 per cent, and that:

''They do not get out much more than 50 per cent; the other 50 per cent would be left in the mine, which would include pillars, unmerchantable coal, places that had to be stopped, on account of faults, and the coal where rooms had squeezed in so that they couldn't get out the 150 feet in the rooms. As to whether they got out the 150 feet would depend on the roof. Parts of the Raven had a very poor roof; the cap rock cuts out entirely in part of it. When you have a foot of coal in thickness, there would be 1,742 gross tons of coal per acre. By common consent for years back it has been figured that you get 1,000 tons per acre. In this county, the vein is 2 1/3 feet thick. That is what bituminous coal is estimated at in this county. That would make an acre of coal in this county 2,333 tons; that is what they would be able to recover; that is commonly accepted, figuring on a normal mine.''

Other witnesses testified on like lines; and one, that the screenings would be from 4 to 13 per cent. If some of the estimates are to be relied upon, more coal has been taken out and accounted for by plaintiff than was minable! On the other hand, we are satisfied that Hill underestimated the area of abnormal conditions prevailing in the mine, and overestimated · the size of the rooms, and ignored the loss through screening. Only a part of the evidence has been alluded to; and, as the evidence will probably be more definite and certain on another trial, we are not inclined to discuss this phase of the case further.

V.   The method of accounting by defendant is subject to some criticism. In the first place, the lease required a monthly report and remittance. Defendant has reported merely the total tonnage mined annually, with remittance therefor. No claim but that the coal taken out through the shaft of the Raven mine was correctly reported, is made. In 1904, coal mined in the Raven mine was hauled by mules to the end of a tail rope, and by it pulled to the shaft of the Diamond mine. There was a break between the mines in 1908, and some other method seems to have been pursued. The daily record of the output of both mines was kept on the same bulletin. As explained by Trotter,

who was bookkeeper for defendant from 1898 to 1909, the pit boss of the Raven mine furnished the bookkeeper the check numbers of the several miners working in the Raven mine. The weigh boss entered on the daily bulletin the weights of coal mined by each of said miners, and the weights were taken daily from the bulletin by the bookkeeper, and entered on the pay roll to the credit of the miner having a corresponding number. Other bookkeepers of the company corroborate this witness. No separate account appears to have been kept with plaintiffs, and the amount of coal taken from the mine was ascertained by adding the number of tons of coal shown by the pay roll to have been mined and taken out of the Raven mine during the year, and remitting accordingly. Had the total weight of coal taken out each day been entered to plaintiffs' credit, possibility of mistake would have been reduced to a minimum. It was of little or no concern to the men whether the coal was credited to one mine or the other; their compensation from the company would be the same. In other words, the primary purpose of the pay rolls was to show the amount owed to the miners employed, and an error disclosing the wrong mine would be of no significance, save as between plaintiffs and defendant. Error might creep in through taking data from the bulletins, which were destroyed after the miners were paid, in gathering the amounts of coal from the pay rolls throughout the year; and mistakes did occur, which, however, were voluntarily corrected. Thus, in 1905, there was an omission of 7,681 tons of coal, for which $307.24 was remitted later. At another time, there was an overpayment of $218.23, which was corrected; and, after the commencement of the action, $726.95 has been paid plaintiffs on 10,350 tons of coal mined in 1916, and 7,823 tons and 1,650 pounds mined in 1917, not previously reported. Are there other errors in defendant's manner of accounting for the coal mined, not discovered? Its voluntary course in correcting the mistakes discovered strongly tends to establish its good faith, but the fact that these mistakes occurred, and its system of ascertaining the amount of coal taken from the Raven mine yearly from pay rolls made up in connection with the other mine, instead of crediting the daily, or even monthly, output to plaintiffs', or the Raven, mine, cast doubt on the reliability of the accuracy of the vouchers fur-

nished, and remittances made.  It will not do, however, to over-throw these on a mere speculation as to the amount of coal removed.  The evidence adduced, tending to show that lump coal in excess of that reported, and on which royalties have been paid, has been taken from the Raven mine, must appear to be more reliable than the data furnished by the records kept by defendant, its yearly computations, in connection with the evidence adduced, tending to show that all or more of the lump coal removed probably has been accounted for.  With these suggestions, the court's order in granting a new trial is—*Affirmed.*

WEAVER, C. J., STEVENS and ARTHUR, JJ., concur.