JOSIE SNYDER, Appellant, v. E. E. GUTHRIE et al., Administrators, Appellees.

**NEW TRIAL:** Erroneous When Verdict Supported. An order granting
1  a new trial on the sole ground that the verdict is *without adequate*
*support in the testimony* is erroneous:  (1) When the testimony
presents a fair jury question; and (2) when plaintiff has presented
all the testimony he will ever be able to present.

**WORK AND LABOR:** Presumption Because of Family Relation. No
2  presumption exists in favor of the father of minor children that
services performed by an aunt in the family of the grandparent in
caring for the said children were gratuitous.

*Appeal from Warren District Court.*—LORIN N. HAYS, Judge.

APRIL 4, 1922.

APPELLANT filed her claim against the estate of her deceased
brother, C. F. Snyder, for the care of his five minor children.
She claims that her services began November 1, 1892, and for
one child she claims the care for 112 months, another 124 months,
another 165 months, and for the child who died, 10½ months,
all at the rate of $25 per month each. She claims that said
services were rendered at the request of deceased, and under the
agreement by and between them that the services should be
paid for, and that payment should be made from the estate
of deceased.

The answer denies that there was any. agreement; denies
that plaintiff expected compensation, or that deceased contemplated payment or agreed to pay; and alleges that, if any services were rendered, they were gratuitous; denies that the services sued for were ever rendered; and alleges that, if they were,
the charges therefor are excessive, and that, if said services were
ever performed, the right to recover is barred by the statute of
limitations, and that plaintiff was remunerated by having received contributions and support. The claim is for services for
caring for the five small children of deceased from about the
time of his wife's death, in 1892, until about 1905. One of the

five children died a short time after his mother. Deceased, C. F. Snyder, died intestate in September, 1919, and left surviving him his widow—his second wife—and the four children by the first marriage, and five by his second marriage. He had accumulated an estate of about $150,000 or $200,000. Plaintiff's claim was filed June 2, 1920. There was a trial to a jury, and a verdict for plaintiff in the sum of $13,807.50. Defendants' motion for new trial was sustained, on the ground that the evidence was not sufficient to sustain the finding that there was such a contract as plaintiff alleges and that it was payable at her brother's death, so as to avoid the bar of the statute of limitations. The court did not pass upon the question as to whether the verdict was excessive, and some of the other matters raised by the motion for new trial. Claimant appeals.—*Reversed.*

*Clark, Byers & Hutchinson* and *F. P. Henderson,* for appellant.

*A. V. Proudfoot* and *O. C. Brown,* for appellees.

PRESTON, J.—1. Appellee invokes the rule that sustaining the motion for new trial is within the discretion of the trial court, and that the Supreme Court is slow to reverse. This is

1. NEW TRIAL: erroneous when verdict supported.

the general rule, and is so well established that citation of authority is unnecessary. It is not, however, absolute. In a proper case, the Supreme Court will not hesitate to review the order. *Riley v. Monohan,* 26 Iowa 507; *Stockwell v. C. C. & D. R. Co.,* 43 Iowa 470; *Turley v. Griffin,* 106 Iowa 161; *Merchant v. O'Rourke,* 111 Iowa 351; *Busse v. Schaeffer,* 128 Iowa 319; *Nelson v. Western Union Tel. Co.,* 162 Iowa 50; *Mullong v. Mullong,* 178 Iowa 552. In the instant case, the evidence is quite fully set out, and the situation is substantially as fully presented to us as it was to the trial court. Furthermore, it is said that appellant has presented all the evidence it is possible for her to present. The effect of sustaining the ruling of the trial court would be to end the case. In other words, if, on a new trial, the evidence is the same as now, it would be the duty of the trial court to direct a verdict for the defendants. Under such circumstances, the

question is, to all intents and purposes, a question of law, whether the undisputed evidence, or conflicting evidence, is sufficient to take the case to the jury. Under such circumstances, we ought to, and we are disposed to, now determine this vital question. In addition to the cases above cited, see the following cases: *Farnsworth v. Umlandt,* 177 Iowa 39, 49, where the granting of a new trial was reversed on the evidence, the court holding that the evidence was sufficient to sustain the finding of the jury. In that case, there was a verdict for plaintiff, and a new trial granted on the ground that the verdict was not supported by the evidence. *Campbell v. Centerville Block Coal Co.,* 190 Iowa 18, where the evidence was reviewed, and the ruling of the trial court sustained, but the opinion recites that, on a retrial, the evidence probably will be more definite and certain. See, also, *Cooper W. & B. Co. v. National B. F. Ins. Co.,* 188 Iowa 425, 429.

2. It is contended by appellees that plaintiff and deceased were members of the same family, and that claimant was a member of the family in which these children were placed, and that, therefore, the presumption arises that plaintiff's services, if any, were gratuitous. We are agreed that such is not the fact. Much of the argument of appellees is based upon the assumption that claimant and deceased were members of the same family. A family is defined in *In re Estate of Bishop,* 130 Iowa 250, 253. In that case, the evidence is set out, and was held sufficient to take the case to the jury upon the proposition that claimant was not a member of the family. See, also, *Snyder v. Nixon,* 188 Iowa 779, 782, 783; *Armstrong-McClenahan Co. v. Rhoads,* 180 Iowa 710, 713. Claimant is a maiden lady, 58 years of age, and has made her home with her father and mother, J. M. Snyder and wife, in the town of Norwalk, Iowa. At the time the alleged arrangement was made, she was about 30 years old. She still lives in that home, her parents having died after the services claimed for had ended. Deceased was the son of J. M. Snyder. Before the marriage of deceased, he, with two brothers and the claimant and his father and mother, composed the family. At about the time of the marriage of deceased, the J. M. Snyder family was composed of the foregoing and a grandmother. When deceased

*2. WORK AND LABOR: presumption because of family relation.*

married, he left the parental home, and moved to Cummings, Iowa. At the time of the death of the mother of the five children, the oldest child was about six and one-half years old, and the youngest, three months. The youngest was a boy, who died less than a year after his mother. The other four were girls. Upon the death of the mother, the five children were taken to the home of J. M. Snyder, and turned over to the claimant, under an agreement, as she claims, that she was to care for the children, look after their personal welfare, keep their clothes clean and repaired, look after their schooling and training, and do whatever else was necessary to give them the motherly care and attention such children would require, for which she alleges she was to be paid liberally out of the estate of her brother, C. F. Snyder. At the time this alleged arrangement was made, deceased was a contractor and builder, just beginning a successful career. He had a number of building jobs, and was employing a number of men, so that it was important that he should have some arrangement with respect to the children that would make it possible for him to devote his time to his business. Appellant also alleges that it was also arranged between deceased and claimant and his parents that the children's board, as well as their clothes, was to be paid for by deceased, as their needs required. The children remained with claimant at this time for about a year and a half, when deceased married again; and after he re-established a home, the four girls, the boy having died, were moved from the J. M. Snyder home, and from the care of claimant, to the home of the deceased, for a period of two years, and they were cared for by the stepmother. Because of trouble between the children and the stepmother, the four girls were returned by the father to the care of the sister, under the same arrangement as before, as plaintiff alleges: that claimant was to have full and complete charge of the care, education, and training of the girls, and was to be paid, as before stated. After the children were returned to claimant, or, as defendants choose to call it, to the home of J. M. Snyder, the four girls remained there and were cared for by claimant until they arrived at their maturity and marriage. One of the girls so remained for something over nine years, another more than ten years, another twelve, and the youngest nearly fourteen years. Claimant's two brothers mar-

ried, and left the J. M. Snyder home. The evidence tends to show that deceased was away from Norwalk a part of the time, and that, when in Norwalk, he made his father's home his headquarters, and for a time, after the death of his wife and before his second marriage, lived in the home of his father. We understand that the reason, or at least one of the reasons, for the rule that, where parties are members of the same family, their services are presumed to be gratuitous, is because one rendering service to the other or others receives reciprocal services in return. It is not claimed, and could not be, under the evidence, that deceased was the head of the J. M. Snyder family, wherein the children were placed, or that it was under his management. He was not supporting that family, nor was claimant receiving support from him therein. If there were the usual small amenities between brother and sister, this would not constitute support by him of the family, or create the family relation. Deceased, to say the most, was temporarily, and at intervals for a brief time, staying at the home of his parents, prior to his second marriage. Claimant was not a member of his family, and the fact that the children were placed in claimant's charge and care, and that they lived in the same home with her parents, is not material. She is not claiming compensation from the children, but claims compensation from their father, for their care. As said, we are agreed that the family relation did not exist, as contended by appellees, and that there is no presumption that her services were gratuitous. The presumption obtains only where the family relation exists. We said in the *Bishop* case, supra:

"Such presumptions as the trial court thought arose in this case are based upon the proposition that, as the person performing the service is a member of the family of the one for whom they are furnished, no implied promise arises by reason of the reciprocal rights and duties of the parties. Ordinarily, where one renders service for another which is known to and accepted by that other, the law implies a promise on his part to pay therefor; but, where the party rendering the service is a member of the family of the person served, receiving support therein, a presumption arises that such services are gratuitous. *Scully v. Scully's Excr.*, 28 Iowa 548. This presumption only arises when the family relation is shown. *Marietta v. Marietta*, 90 Iowa 201.

And when the reason for the rule ceases, the rule itself does not apply.''

See, also, *Snyder v. Nixon,* supra; *Linton v. Crosby,* 56 Iowa 386, 389; *Armstrong-McClenahan Co. v. Rhoads,* 180 Iowa 710, 713; *Soderland v. Graeber,* 190 Iowa 765.   See, further, *In re Estate of Ogden,* 152 Iowa 106, 107, 108, where it was said that claimant had never lived as a member of the family of deceased, and that, though their relationship might account for many of the amenities evidenced by the record, it was not such as to obviate the rule that, for the performance of services at the request of or with the consent of another, a promise to pay the reasonable value of the services rendered is implied; and that, had claimant been a member of the decedent's family, it must have appeared affirmatively that the services were rendered with the expectation by the one of receiving, and by the other of making, compensation therefor; that he was not a member of her family, however, and was under no legal obligation to do what he did, and to obviate liability, the burden of proof was on the administrator to show that the services were intended to be gratuitous.   Under the circumstances of that case, it was held for the jury to determine whether a recovery was authorized. See, also, *Yoder v. Engelbert,* 155 Iowa 515, 518.

3.   Coming now to the question as to whether there was a contract, as alleged by claimant, or rather, whether there was sufficient evidence, undisputed or conflicting, to take the case to the jury on that question, and to sustain the verdict.   It appears that, at the close of plaintiff's evidence, defendants moved for a directed verdict on the ground, among others, that the evidence was not sufficient.   We have held a number of times that if, at the close of plaintiff's evidence, there was a jury question, there is still a jury question after the defendant's evidence is in, defendant's evidence but making a conflict.   We do not overlook the cases holding that, in exceptional cases, the defendant's evidence may be so overwhelming, or in some cases the physical facts may so conclusively prove the defendant's case, that the ruling on the first motion is not conclusive. We also recognize the rule that the trial court has a right to change his mind if, on motion for new trial, he considers the evidence insufficient, even though he had previously ruled the other way. It is true, as con-

tended by appellees, that the courts recognize the fact that, after a man is dead, there is a temptation to present trumped-up claims against his estate. *Holmes v. Connable,* 111 Iowa 298, 301. Not all claims are such, however. There are no earmarks in the instant case to cast suspicion upon plaintiff's claim. Concededly, she took these small children, when deceased was left almost helpless, cared for them, and raised them to maturity. It was done openly, and for a long term of years. We shall not go into the evidence on this point. It is enough to say that clearly she faithfully performed the duties of a mother to these 'helpless children. Because a plaintiff's mouth is closed, because of Section 4604 of the Code, it is often difficult to establish a just claim. It must be and may be done circumstantially. If the circumstances and proper inferences are such as that the evidence preponderates, or shows plaintiff's claim to be true by the greater probability, and the jury is so satisfied, then she has made out her case. Cases are cited by appellees to the proposition that, where services are performed by one who is a member of the family, and where it is necessary to show an express contract, the express contract may be shown by showing that one expected to pay and the other to receive pay for the services. Though the question was raised by defendants in the answer, on the theory, we take it, that claimant was a member of the family of deceased, the case was not tried on that theory. The matter is now referred to as bearing upon the question that the claim may be shown circumstantially. It is argued by appellees that there is no evidence tending to show that there was any expectation on the part of claimant to claim or receive compensation. *Traver v. Shiner,* 65 Iowa 57, and other cases are cited on this proposition. The *Traver* case was distinguished in *In re Estate of Squire,* 168 Iowa 597, 605, as to the facts. We think there are circumstances in the record tending to show that claimant did expect compensation. We think that the fact that claimant took these children and cared for them as she did, is of itself a strong circumstance to show, not only that she expected compensation, but that there was a contract, as she alleges. Deceased was abundantly able to pay for the care of his children; it was necessary that they should be cared for; it was his legal duty to support his children. There was no such

duty resting upon claimant; she was of limited means; the children, especially when very young, would be no help to her. Under such circumstances, it would be preposterous to think that she would assume this burden for 15 years, for nothing. It is true, we have held that these circumstances alone may not be sufficient to overcome the presumption, if she had been a member of the family of deceased, or to establish the contract; yet they have probative force, and are entitled to be considered by the jury in determining the ultimate question. *Snyder v. Nixon*, 188 Iowa 779, 782. We have also held that declarations of deceased, standing alone, may not be sufficient. *Soderland v. Graeber*, 190 Iowa 765. They are competent, however, and all the circumstances in the case must be considered. Appellees seem to concede that, if plaintiff was not a member of the family, there would be an implied contract, under which deceased would be liable, but contend that the express contract relied upon must be established, including the provision that the claim was payable at the death of the deceased, or that he would make provision in his will, in order to avoid the statute of limitations. We understand this to be appellant's proposition. The mere fact that deceased did not comply with his contract, either through oversight or design, would not be a defense, if the contract is shown, and the services performed. Some of the circumstances bearing upon this question have been already referred to. We shall now refer to some of the more important evidence in the record, and we shall attempt to not go too much into detail.

Witness Kern testifies to the care the children received, and that they were kept and sent to school.

Palmer, the son-in-law of deceased, having married one of these five children in 1908, says that he knew his wife and claimant well for 10 years before his marriage; was frequently at the home, both before and after his marriage; that Grandmother Snyder was an elderly lady, not very strong, and did not do very much work; that plaintiff was the only daughter of J. M. Snyder; that she did the housework in her father's home; that he knows that all the children lived there; that plaintiff seemed to be the boss, when any orders were given; that everything was kept in good shape.

Mrs. Beery, after testifying that she was acquainted with this family situation for 24 years, and was acquainted with the deceased, the ages of the children, and so on, says that plaintiff was looking after the girls; that they were well cared for and sent to school; that the grandmother was about the house as an elderly woman would be; that plaintiff conducted a millinery business for a short time; that it seemed to her that plaintiff was considered the head of the household; that everybody considered her so, because her mother was not able to do it; that her mother was sick in bed a part of the time.

Mrs. Humphrey visited the Snyder family in 1912, and had a conversation with deceased. Deceased, plaintiff, and her father and mother, and other members of the family, were talking about plaintiff's staying at home and caring for the children all her young life. At this time, the children were grown, and some were married. Deceased said he intended to pay Josie for caring for the children, and pay her well; that no one knew what Josie was to him in the caring for his children. Witness had received a letter from deceased, in which he told about his children and about plaintiff's caring for them; that his wife had died, and he had taken his children to plaintiff and Uncle Madison, for her to look after them. In the conversation with deceased, he said that he intended to pay Josie for caring for the girls. Deceased did not say how much he was going to pay for it, or how much his father and mother had to do with the care of the children. Deceased said that Grandmother Snyder was not very well, and did not do very much. Grandfather was 87 or 88 when he died, and his wife about 82 or 83.

Mrs. Black, after testifying to her acquaintance with the family and deceased, the death of his wife, and her acquaintance with the children of deceased, and his marriage, says that the children were cared for at the grandfather's place; that they were at first tiny things, and were cared for better than in the ordinary home. She testifies to the conversation testified to by Mrs. Humphrey, with deceased, about the children and plaintiff; that there was a gentleman paying attention to Josie, and the question came up about the probability of her getting married; that deceased said he did not want her to get married, because there was no one to stay at home with the old people; that wit-

ness and Mrs. Humphrey told him that Josie had as much right to a husband and a home as other women, and that it was natural and proper that she should; that deceased said that there was no one to take care of father and mother, and witness said:

"That makes no difference; you have had two chances, and besides, you owe her a great big debt for raising your children."

And he responded, "I know that," and said:

"I am going to pay her for taking care of those children and father and mother; you know I can do it, and of course I intend Josie shall have her chance."

He seemed very appreciative of the way plaintiff had done,—sent the children to school, and taught them morally,—and said that they were a credit to him. He said over and over again that he was going to pay for what she had already done in taking care of the girls, and that he would make it right with her, if she would stay, and give up this idea. He did not say anything about having made any payments for the care of the children; only that he was going to pay her for what she had done. Witness says that plaintiff took care of the children during the time the girls were young. In that conversation, nothing was said about Josie's being paid out of the estate at his death, or his proposing to pay her during his lifetime. He said he proposed to pay her some time. This conversation did not include the caring for the father and mother until they died, because he was trying to keep his sister from getting married. She further testifies that he was trying to hire her off, so that she could take care of her father at that time; that he proposed to compensate her for doing that, as well as for taking care of the children; that there were two parts to the conversation,—the first part was that he did not want Josie to get married, and then he said he owed Josie a big sum,—he acknowledged it. Josie never lived anywhere else.

Dora Palmer, one of the children in controversy, and the wife of the witness before referred to, after testifying that her father and mother first lived in Norwalk, and then at Cummings, about five miles distant, and that her Grandmother and Grandfather Snyder were living at Norwalk, and plaintiff lived with them, and as to the ages of the children, says that, after plaintiff decided not to stay at Cummings, the children moved to Nor-

walk with the folks. She gives the names of the members of the family, and says that, as far back as she could remember, it was always plaintiff who decided where the children should go and with whom they should go; that, when they had any new clothing, it was plaintiff who made the decision; that she and her sisters were in plaintiff's care; that, after her father was married the second time, the children were switched back and forth five or six times; that the training, sewing, washing, ironing, and mending were all done by plaintiff; that there were times when her father had someone make a dress or two for the girls; that two of her sisters graduated from high school, and they all taught school; that plaintiff kept them in Sunday school, and was careful about them; that, if any were sick, it was plaintiff who waited on them; that, when witness was 14, the children all had the measles at the same time; that two of them were sick, and it was thought they would die; that plaintiff was up with them almost every night, and took care of them all in the daytime; that this was so with all their ailments; that her father was living with his second wife in a house three or four blocks away; that the washing was all done in the home; that her grandmother was very large, and heavy on her feet, and not able to do very much,—could wash a few dishes, or the like; that the washing and mending, and things of that kind, were done by plaintiff, with the help of the girls, when they got old enough. Witness testifies in rebuttal that, before the children were taken back to plaintiff a second time from their stepmother's, witness was ruptured, and was ill when they went back; that witness suffered from this until five or six years ago.

Mrs. Courtenay gave similar testimony as to the care and raising of the children, as did Mrs. Lawrence.

Mrs. McMahon, one of the children in question, gave similar testimony, and as to her being taken to the home of their grandfather, and being taken care of by plaintiff; that they all ate at the same table with the two brothers of deceased, plaintiff, and the old people; that plaintiff did the housework, in the way of getting meals, etc.

Albert Snyder, brother of deceased, left home when he was 21, for a little while, and then came back and stayed until he was 31. Was the partner of deceased for 20 years, off and on;

bought farms together, and were in the lumber business together; he testifies as to the children and their care, substantially as the others. After Charles' wife died, and before they took the children to Norwalk, deceased said he did not know what he would do with the children. Witness suggested that they take them to his parents, to which deceased objected, saying that the folks were too old. Before they started to move, deceased asked plaintiff if she would take care of the children, if he took them to Norwalk, and she said she would. There was no price set; deceased said he would make it right with her, to do the best she could with them, because he did not want to separate the children. The children were then taken over and put in plaintiff's care. He describes the care she gave them. Plaintiff had more than she could do. The mother helped some, but plaintiff had full charge of things,—he was at home enough to know that. She had full charge of the children, sewing for them properly, and so on. Deceased was there Sundays. During the 30 years, deceased was successful. A few weeks before the death of deceased, witness had a conversation with him at the home of the witness in Kansas. Deceased came there for a settlement. His health was failing, and he wanted to get cleaned up. He said he wanted to settle with his sister; that it never had been settled; that he wanted to settle with her, and he had never made a settlement. While deceased was in Kansas, there was turned over $1,500 to him, and later, a balance sent, which, in all, amounted to $13,000. Witness says that the value of plaintiff's services to each of the children was $25 per month; that his father and mother died in the home where plaintiff was in charge.

Delbert Wesley Snyder, 53 years old, another of the brothers of deceased, says he left home when he was 30 years old; that, prior to that, he lived at home with his father; that he was well acquainted with his brother's family and the conditions generally, which he testifies to in detail; that he was a carpenter, and worked with his brother, Charles; that he observed the everyday life of the children and the manner in which they were cared for; that he has a family of children. He says that the value of the services rendered by plaintiff in the care of the five children was from $40 to $50 a month each; that she put in her time with the children; that the children were taken to

their father's home after he remarried, and then came back to the grandfather's and the care of the plaintiff; that, during a period of twelve years, he had many conversations with his brother as to the manner in which he was going to provide for the payment of plaintiff; that he, deceased, told him he was going to provide for her in his will; that he so said many times; that witness was foreman for deceased two years, and during that period, the matter of his sister's pay was frequently mentioned; that, about three weeks before Charles was taken with his final illness, he had a talk with deceased about the matter of paying plaintiff; that his brother told him that he intended to allow her more than any of his heirs; that his brother, in this conversation, thought he ought to stand 50-50 with him (Charles); that witness said to deceased, "I think you ought to stand more than I do," and deceased responded, "That matter with plaintiff is an absolutely different proposition; I am taking care of her in my will." He also testifies that, later in the same conversation, when the two were discussing the question of taking care of the old people, witness said to deceased, "Look at the work plaintiff has done," and deceased responded:

"That is a different proposition entirely; I am going to take care of her, and make provision for her in my will."

Witness also testified that, in the later years of his brother's life, he was well supplied with money, and that, at the time of his death, he was worth between $200,000 and $300,000.

It is thought there is some contradiction as to some of the circumstances. Mr. Guthrie, one of the administrators, testifies to his acquaintance with the different people, and says that he lived in part of the house for a time with the elder Snyder. His recollection about who was doing the housekeeping is not definite. He says it has been a good while ago,—has been some time ago; that, as he remembers it, Grandmother Snyder and plaintiff did the work; that he built a house of his own, while he was living at Snyder's, and moved there, and has lived there ever since. He gives his observation of the living at the Snyder house, as he came and went. He testifies that the value of plaintiff's services would be $8.00 to $10.00 per month for all four children; that that kind of wage was low then, and is a little higher now; that $10.00 would be the maximum; that deceased

was careful in his business; that deceased "did business at our bank;" that the papers came into the possession of the administrators after the death of Charles. He testifies to finding among the papers a card made by deceased during the Liberty Loan drives in 1918, which was offered in evidence, but we do not find it indexed or in the record. Witness testifies to the amount of personal property coming into the hands of the administrators.

The other administrator testifies that he knew deceased a good many years, and the other persons referred to in the record; that he can't say that he was ever in the Snyder home; that he knows of the fact that the children were placed in the home, and about when it was; that all the children were placed there; that he has one child, and has had a good deal of experience in housekeeping, house furnishings, etc.; that he cannot say what it would be worth to care for the children,—would have to base his judgment on what ordinary labor was worth at that time; that, for the oversight, without furnishing provisions or clothing, and for the character of services alleged, he would think it was worth $5.00 per week per child.

Mrs. Snyder, the widow of deceased, testifies to the date of his death, and the children surviving, and their ages; that she is 61 years old, and her husband about the same age; that they were married in April, 1894; that they did not commence housekeeping until the next August, because they were building a house in the south part of town; that they stayed at her mother's home; that, at the death of the first wife, the family was brought to the home of the elder Snyders; that she saw them there; that the children came to her house in August after her marriage, and after a time, they went back to their grandfather's. She says she was in the J. M. Snyder home occasionally, and describes conditions there; that she thinks it would be worth $4.00 or $5.00 a week to care for the children, for all of them, until they left the home and care of plaintiff. She thinks the children were not kept neat and nice. She remembers that one of the girls was hurt at school,—not very badly,—does not know how long the girl suffered after the injury. She says that she was seldom in the Snyder home after that. She also testifies that she was present at the time other witnesses say there was a discussion about plaintiff's getting married. "Nothing of that kind was

said that I heard.'' She says she heard Mrs. Black swear that witness was not present. She also testifies that, from April to August after her marriage, she stayed at her father's, and her husband stayed at his folks', a part of the time; that the children came to the new home the middle of August.

''We had no trouble in our family until it was made out of the family. Whenever the children were away from home and came back, they brought news. Don't know how long it was after we got into the new home that the trouble commenced.''

Fred Prine testifies to the value of the services, but says he knows nothing about what care the children got; saw them around, is all; doesn't know when they were sick or how often. He says that a young infant requires constant care, if it is sick; that a little girl 6½ years old, ruptured, needs special care; that he had no knowledge of such things.

Martens testifies to his acquaintance with deceased, and gives the value of the services; Mrs. Martens, the same. They give the value at from $20 to $25 per month for all four.

This is the substance of all the testimony introduced on behalf of the defendants. The opinion is already too long, and we shall not further discuss the law or the evidence, except to say that, in our opinion, there was a question for the jury, and that the verdict of the jury was sustained by sufficient evidence as to the contract, and that it was payable at his death. The statement of deceased to one brother, four or five weeks before his death, that he had not settled with plaintiff, and that he intended to do so, in connection with other circumstances, such as that the services were performed by plaintiff at the request and with the consent of deceased, and that she accepted the employment, and performed the services thereunder, and the fact that there is no evidence to show that plaintiff had been paid, and the further fact that there is no evidence that plaintiff ever asked her brother in his lifetime to pay for her services, strongly supports the claim that the services were to be paid for from the estate of deceased at his death. The services had then all been performed, and he was then nearing death. Up to that time, they had not been paid. In connection with this are the repeated statements by the other brother that deceased had told him that he was going to compensate her by will. This, too, was a very

short time before his death, and about the time he was stricken with his fatal illness. The testimony in regard to these matters is undisputed. This evidence, and the circumstances before referred to, indicate that it was the purpose of deceased from the start that plaintiff should be paid out of his estate, and that there was an agreement to that effect, as claimed by plaintiff. While we are only called upon to pass upon the question as to whether the evidence was sufficient to take the case to the jury, and sustain the finding, we are ourselves satisfied that plaintiff's claim is a just one. The children themselves, who are interested as much as anyone, in so far as they have expressed themselves, so consider it, and evidently desire it paid, since they are assisting plaintiff in the case. The two brothers, who were intimate with their brother, seem to be of the same opinion.

The judgment is reversed, and the order granting the new trial is set aside, with directions to the court to enter judgment on the verdict, and establish the claim of plaintiff against the estate.—*Reversed.*

STEVENS, C. J., WEAVER and DE GRAFF, JJ., concur.