LILLIAN C. NEWELL, Appellee, v. ESTATE OF SAMUEL NEWELL et al., Appellants.

**EXECUTORS AND ADMINISTRATORS:** Claims—Liberality in Proof.
1   Principle reaffirmed that the conformity of proof to allegation required in ordinary actions is a rule not applicable to claims in probate.

**EXECUTORS AND ADMINISTRATORS:** Claims—Jury Question.
2   Evidence reviewed, relative to the claim of a wife against the estate of her deceased husband for money loaned, and held to present a jury question, and not a question of law for the court.

*Appeal from Wapello District Court.*—F. M. HUNTER, Judge.

OCTOBER 17, 1924.

APPELLEE, the surviving spouse of Samuel Newell, deceased, filed a claim against the estate of her husband for $2,000 and interest, alleged to have been advanced by her to her husband in his lifetime under an agreement that the same would be repaid to her. By an amendment to her claim, she claimed the further sum of $1,100 and interest, for money alleged to have been advanced to him under a like understanding. The first claim was filed September 26, 1921, upon which plaintiff claimed interest from March 1, 1919. The amendment, setting up the second claim, was filed October 22, 1921. At the close of all the testimony, on plaintiff's motion, the court directed the jury to return a verdict for her in the sum of $3,738.10. Such a verdict was returned, and the amount was by the court allowed as a claim against the estate. The defendant appeals.—*Reversed.*

*Roberts & Webber* and *Thomas J. Bray,* for appellants.

*Jaques, Tisdale & Jaques,* for appellee.

PRESTON, J.—The original claim recites that it was for cash advanced on or about March 1, 1919, under an agreement and understanding that the same should be repaid to her, with interest thereon at 6 per cent from said date, $2,000, and that the circumstances connected with this transaction are, briefly, as follows: That, when decedent bought the O'Neil 40 acres, he did not have money enough to pay for same; that this claimant had $2,000 of her own individual money which she had inherited prior to her marriage, and she let her husband have same on the understanding that he would repay her therefor, and her said husband used the money as part of the purchase money of said land; that said money has never been repaid. The amendment recites that it is for cash advanced on or about March 1, 1920, under an agreement and understanding that the same should be repaid to her, with interest, $1,100, and that the circumstances are that, when deceased bought the Ross 190 acres of land, he did not have enough money to pay for same; that this claimant had $1,100 of her own individual money, which she had inherited prior to her marriage, and she let her husband have same on the understanding that he would repay her therefor, and her husband used the money as a part of the purchase money of the Ross land; that it has not been repaid.

The claimant and deceased were married October 7, 1908. Decedent died August 12, 1921. In September, 1921, claimant petitioned the court for appointment as administratrix, and she was appointed and qualified. Later, A. W. Enoch was appointed to investigate in regard to the claim of plaintiff.

The answer, in addition to a denial of the claim, pleads the statute of limitations.

1. The principal question, as appellant states it, is that plaintiff was not entitled to a directed verdict because the facts necessary to be established by her were not admitted in the pleadings or conceded on the trial or proved by undisputed evidence; and second, that the burden was on claimant to prove

not only that she had advanced money to her husband, but that there was an agreement to repay it; that, if the wife advances money or property to the husband, to be employed in his business, without a contract to repay the same, the reasonable presumption is that the advancement is made in view of the mutual benefits which are likely to accrue from the use of the advancement; that a gift from a wife to her husband of property belonging to her separate estate, in the absence of all evidence that it had been given to him to be held in trust for her use, or of a promise on his part to repay it, is presumed to be intended as an absolute gift, and she has, therefore, no claim against his estate; and that, under the circumstances, the law will not create the relation of debtor and creditor between the parties, or imply an agreement when the parties have not entered into one; and that, consequently, she cannot recover in an action against him or his estate. The argument on the second proposition is as to the form of the statement or allegation in the claim and amendment. The thought is that the real claim is that there was a specific contract or agreement by the deceased to repay, and that the allegations state

1. EXECUTORS AND ADMINISTRATORS: claims: liberality in proof.

only an implied agreement. Appellee urges that this is sufficient. We have held that it is not necessary that a claim in probate be stated with the same fullness and particularity as a petition in an ordinary case, and that the same conformity of proof to the allegations of the claim is not required as in an ordinary action; that the same formality is not required; that liberality is indulged in stating a claim in probate. *Craig v. Estate of Craig,* 167 Iowa 340; *Harrison v. Harrison,* 124 Iowa 525, 528; *Thompson v. Romack,* 174 Iowa 155; *In re Estate of Howell,* 179 Iowa 969, 974. Considering the allegations of the claims and the law, we think appellant has no just cause for complaint at this point.

2. At the August, 1922, term of the Wapello district court, the claimant was a witness in an action entitled Ellis v. Samuel Newell. She testifies in this case that she then testified that:

2. EXECUTORS AND ADMINISTRATORS: claims: jury question.

"The money that I had filed a claim for here was loaned to my husband shortly after we were married, in 1908. I told Mr. Jaques that I had a claim for $2,000.

"Q. How much of that money did you earn as a girl? A. I had about $5,000. Q. Well, how much did you earn of that? A. Well, I suppose I earned it all. I put that $2,000 into the O'Neil place right after I was married, in 1908."

Of the foregoing testimony, appellee says, in argument:

"It matters not what Lillian C. Newell testified to in the case of Ellis v. Newell as to the time she loaned the money to her husband. She did not testify that she then put the money in the O'Neil place, but her husband had got the money and used it for various purposes, and thereafter got additional money that was used in the purchase of the O'Neil place. This claim for $2,000 and the amendment thereto for $1,100 are not based on moneys loaned in 1908, but on the cashing of the two certificates for $2,000 and $1,100 at the times shown by the testimony."

As to the last statement, it may be remarked that the claims as filed do not refer to the certificates of deposit, so that there is some discrepancy between the claim as filed and the claim now made. We recognize the difficulty in proving claims against estates, because of the dead man's statute, and that this difficulty applies to claims which are just. Some claims are so, and others are not. As administratrix, claimant had possession of the papers of her deceased husband, and she had knowledge of the certificates before the claims were filed,—at least the amended claim. She testifies:

"I have in my possession all of the papers, checks, and records of deceased, besides what the Kirkville bank had. I have some checks that were issued by deceased in his lifetime, and a large number of receipts, either at the bank or in my home, in my possession and under my control. I did not bring them to the trial. I did not think it was necessary. * * * When I filed the first claim, I had been advised that I wouldn't be permitted to testify to any personal transaction with deceased, and that, in order to prove my claim, I would have to get outside evidence as to the loaning of this money to deceased. I read the claim over, and knew what it contained before I signed and swore to it. * * * At the time I filed the second claim, in October, I had then ascertained the fact in regard to these certificates of deposit in the Chillicothe Savings Bank, and knew that I could

show the facts by other evidence than my own. * * * When I filed the second claim, I do not know if I had full knowledge of what the records of the Chillicothe bank showed. I had knowledge enough to know that I had two certificates.''

Claimant attempts to explain this discrepancy by showing that, on October 6, 1921, some two weeks before the second claim was filed, she had a letter from cashier Jenkins, of the Chillicothe Savings Bank, to her, saying:

''Am sending you copy of certificates of deposit you had with us.

''When Made

''$2,000.00 on August 26, 1918<br>
''  2,000.00 on February 26, 1919<br>
''  1,100.00 on August 26, 1919

''When Paid

''$2,000.00 on February 26, 1919<br>
''  2,000.00 on August 26, 1919<br>
''  1,100.00 on February 26, 1920.''

It seems to be conceded that the $2,000 certificate of deposit, dated February 26, 1919, was a renewal of the one dated August 26, 1918. A deposit slip was introduced in evidence, dated February 25, 1920, ''Samuel Newell in the Chillicothe Savings Bank, certificate and interest, $1,122.''

In regard to claimant's testimony in the Ellis case, we think it does matter, and that it is of some importance. It is in the nature of impeachment, and contradicts her present claim. It affects, to some extent, her credibility as a witness and the good faith of her present claim, and bears upon the question as to when, if at all, she let deceased have the money. Ordinarily, the credibility of witnesses and inferences to be drawn from their testimony and questions as to good faith, and so on, are not for the court. *Wildeboer v. Petersen,* 187 Iowa 1169, 1170; *State v. Carpenter,* 124 Iowa 5, 11; *Hess v. Dicks,* 192 Iowa 378, 382.

Again, it is argued by appellee that witness Abegg ''testified that deceased had a guardian's account in his bank, the Kirkville Savings Bank,—not the Chillicothe Savings Bank,—of be-

tween $8,000 and $9,000; that half of it belonged to his ward, and from what Samuel Newell said to him, he got the impression and the understanding that half the balance belonged equally to Samuel Newell individually, and the other half of the balance to his wife, Lillian C. Newell.''

Here again the inference is sought to be drawn that the $2,000 claimed in the original claim is a part of this $8,000 or $9,000. Much would depend upon the question as to whether the amount was $8,000 or $9,000, and whether it was shown that one half the balance belonged equally to deceased and claimant. In that way, it might be reasoned or inferred that in some way $2,000 of that money belonged to claimant. Naturally, the inference would be less strong if the amount was $9,000. It would not figure out. The evidence is not as broad as claimed by appellee. Because of the importance of this, we shall set out the record. There is a dispute between counsel and a conflict in the abstracts, as to whether witness did say that one half the balance belonged equally to deceased and claimant. Some leading questions were asked in regard to this, and the court took a hand in it. The record is:

''Mr. Newell came in and made a deposit the last of January, 1920. He had shipped some stock to Chicago, and he had the draft sent back to our bank from the Chicago bank. Then he had a shipment of hogs in February, and he had that deposited to an account he had there as Samuel Newell, guardian, and the account ran up to between $8,000 and $9,000. He said, 'Some of this belongs to me, and some to my wife, and some to the guardian.' He said about half of it belonged to the guardian, and the other part was divided between him and his wife. The *essence* of the conversation was that he *supposed* the balance belonged to each other, half and half. That would be something like $2,000. That talk was in February, 1920, in the bank.

''Q. How much was divided between him and his wife? What portion was his and what portion was his wife's? A. Mr. Newell said that 'part of this belongs to the guardian, part of it belongs to my wife, and part of it belongs to me;' and he says, 'about half of it belongs to the guardian, and the balance of it belongs to me and my wife,' and I inferred * * * Q. Just

state what he said, as near as you can.   A.   That is all of it.
Q.   What, if anything, did he say about the portion that be-
longed to the wife?   (Objection as leading, suggestive, repeti-
tion, etc.)   A.   Well, I don't know exactly what he..did say,
but I can tell what I *inferred*.   Q.   Was there anything said
there in that conversation by Samuel Newell that would show
or indicate what amount of money belonged to the wife; and if
so, state what it was.   (Same objection.)   A..   That is pretty
hard for me to answer, because I do not remember. just what was
said.   I know what conclusion I formed.   Q.   Give the substance
of what he said.   (Same objection.)   Q.   If you can't give the
exact language, give the substance.   (Same objection.)   A.
Well, the essence of the whole business * * * (Objection.).   Q.
Go on and answer in your own way.   (Objection.)   A.   The
essence of the conversation was that he supposed the balance
belonged to each one, half and half.   That would be something
like $2,000.   (Defendant moves to strike the answer as an opin-
ion and conclusion of the witness, and as a supposition of the
witness, and incompetent for that reason.)   Q.   That is the sub-
stance?   A.   That is the substance.

"Court:   Since he has repeated his answer, I overrule the
motion.   Gentlemen, I desire to have a little clearer under-
standing before we leave that branch of it.   I do not understand
whether the witness testified that the essence of what he said has
been given, or his conclusion of what was said, or whether it
was the substance of what he said.

"Q.   Do you mean by the word 'essence,' the same as the
meaning of the word 'substance?'   In using the word 'essence,'
did you not mean the same thing as the word 'substance,' or
substantially the same?   (Objection as leading.   Sustained.)

"Court:   Let the witness explain.

"A.   Let me explain what I mean.   Mr. Newell was in the
bank there, and he and I was talking about this deposit.   He said
this: it was in the guardian's,—he kept the account in the
guardian account.   There was between $8,000 and..$9,000.
'Now,' he says, 'this don't all belong to the guardian account.'
He says, 'Some of it is the guardian's and some of it is mine
and some of it belongs to my wife.'   He says, 'About half of this

belongs to the guardian, and the rest belongs to me and my wife.' What conversation followed that, I do not know; but he left the impression with me that it was half and half. (Defendant objects to the impression, and the objection was sustained.)

"Q. Give the substance of what he said to you after the guardian's half was taken out,—to whom that belonged? A. I told you everything I know about it. You can take that and form your conclusion without coming down to a fine point and get it down to dollars and cents. I don't remember all the conversation."

Then follow three or four pages more of questions and answers and objections as leading as to the impression of the witness and the substance of what was said, and so on, the objections to which were generally sustained; but where the witness was permitted to answer, as above set out, they were overruled. The testimony of the witness, taken as a whole, is his impression and conclusion. It was not proved conclusively and without dispute that exactly $2,000 of this $8,000 or $9,000 was the money of claimant,—at least, it is not so clearly so as that the trial court could so say, as a matter of law.

Again, it is argued by counsel for appellee in referring to the $2,000 renewal certificate dated February 26, 1919, substantially:

"Evidently the money represented by this certificate of deposit, belonging to claimant, was used by deceased as a part of the purchase money of the said 40 acres of land bought of O'Neil. The original claim was for this money of hers used by him in cashing said certificate of deposit."

Plainly, this is an inference which appellee seeks to draw from the fact that the deeds were made at about the time the certificates, or some of them, were dated, and because the two certificates claimed for were made out in claimant's name; but we do not understand that it is claimed that claimant knew they were made in her name, at the time they were given. Neither is it claimed that claimant herself put the money in the bank, for which the certificates were issued. Neither cashier Jenkins nor anyone else so testifies. The nearest he comes to it is when he says:

"The Lillian C. Newell that I have testified had these certificates of deposit is this lady sitting here in court, the claimant."

Claimant testifies at this point:

"I have seen Exhibit A, $2,000 certificate dated August 26, 1918. I had it in my possession on that date. I have seen Exhibit B, $2,000 certificate dated February 26, 1919, and had it in my possession on that date."

Cashier Jenkins testifies:

"I did not write Exhibit A or B. I did write Exhibit C, and was there when that was written. That is the same day that this $2,000 certificate of deposit Exhibit B was cashed. I have no knowledge of deceased paying for that draft in any other way than by using this certificate of deposit. If he had paid for it in cash, we would have no record, or if it was a draft on our bank, we wouldn't have any record. I have no recollection of Lillian C. Newell being there at the time this draft and certificate of deposit was made out. When Exhibit C was cashed, on February 24, 1920, I signed Lillian C. Newell's name on the back. I would say that she was not present at that time. I don't know whether deceased or claimant told me to indorse her name on this Exhibit C for $1,100. Claimant didn't get anything on Exhibits A, B, and C. She never had a checking account in my bank. Her name first appears on our books in a certificate of deposit, this Exhibit A, for $2,000, issued to her August 26, 1918. The next entry on our books of any transaction with her is on February 26, 1919, which refers to a certificate of deposit of that date for $2,000; the next, Exhibit C, a certificate of deposit for $1,100, payable to her. I have nothing more on my records relating to her."

The impression we get from the record is that the money was put in the bank by deceased, and that he afterwards received the money. Jenkins, cashier of the Chillicothe bank, testifies:

"Have been cashier since 1911; have general charge of the books showing deposits and checks and accounts generally. Have in my possession some certificates of deposit issued to Lillian C. Newell. Exhibit A is a certificate for $2,000, dated August 26, 1918. I know whose signature that is on the back of this

exhibit. It is Lillian C. Newell's. Exhibit B is a certificate dated February 20, 1919, $2,000, to Lillian C. Newell. That is Lillian C. Newell's signature on the back. Exhibit C is a certificate dated August 25, 1919, for $1,100. I indorsed that certificate on the back, 'Mrs. Lillian C. Newell, by G. E. Jenkins, cashier.' The certificates bear interest at four per cent. Exhibit C was due August 25, 1919, and the stamp shows it was paid February 24, 1920, six months after it was issued; and there would then be $22 interest. Deceased deposited in our bank $1,122, February 25, 1920. The only recollection I have of any money deposited by deceased at that time was this $1,122. That $1,122 was afterwards checked out by deceased. Exhibit B is a renewal of the first certificate. The certificate Exhibit C was made when this $2,000 one was paid, and was issued for $1,100 on the same date. Exhibit B is a renewal of the other $2,000. We have nothing on our books to show that the second $2,000 certificate was taken for the other certificate, only by the dates. To my knowledge, there was never a certificate at any time in my bank in favor of claimant at any one time, to exceed $2,000. Our books show that the bank issued to Samuel Newell a draft about August 25, 1919, the same date that Exhibit B was paid. Our record is, 'August 26th, 1919, issued to the Eddyville Savings Bank, Eddyville, Iowa, draft No. 2204, face of draft $1,501, purchased by Samuel Newell.' I am reading the above from the draft register kept by me in my handwriting, and is correct. August 25, 1919, I issued a certificate of deposit for $500. In 1919, there was one issued for $550. February 25, 1920, deceased deposited in the bank $1,122, as shown by deposit slip. March 3, 1920, he withdrew $1,000, leaving a balance of $122, and on March 2d, he withdrew $21, and on March 3d, he withdrew $1.00, leaving an even $100. I still have the hundred dollars. The ledger shows this was transferred into his account May 18, 1920.''

The warranty deed from O'Neil to deceased, 40 acres for $5,000, is dated February 21, 1919. It is acknowledged and recorded. The warranty deed from Ross to deceased, consideration $17,000, is dated February 28, 1920, and was recorded soon after.

There is a conflict in the testimony of claimant and Jenkins, the cashier, as to the indorsements on the certificates of deposit. The cashier testifies, as before set out, that the signature on the back of Exhibit B, the second $2,000 certificate, was that of claimant. Jenkins testifies that he indorsed her name on the back of the $1,100 certificate. She testifies as to this, that the handwriting on the back of Exhibit B is Sam's (deceased's). She says she indorsed the first $2,000 certificate, and:

"I had Exhibit C in my possession, but did not sign the name Lillian C. Newell on the back thereof. I did not authorize Mr. Jenkins to sign my name on the back."

Claimant gave further testimony as follows:

"When we were married, deceased owned 93 acres of land and 208 acres that his mother deeded to him, and 560 acres at the time of his death. I was not present when either Exhibit B or C was cashed. At the time I filed the first claim, I made no claim for any sum in excess of $2,000. I signed and swore to the amendment, and knew what was in it before I signed it."

O'Neil testified as to the making of a deed to deceased by himself and wife; that he was present when some of the payments were made.

"Saw the check on the contract amounting to $500, and was present when the balance of the consideration, $5,000, was paid. At that time, I did not see a certificate on the Chillicothe bank or the Kirkville bank, or any other bank except the Fremont bank."

We have not set out all the evidence, but because of the conclusion we reach, we have gone into it somewhat fully. We have set out enough to show that there is some conflict in the testimony, and some discrepancies and inconsistencies. We think, too, that there are some circumstances that have a bearing on the question as to whether plaintiff's claim is made in good faith. The testimony of claimant herself is necessarily fragmentary, because of the statute. Deceased was a farmer, dealer in live stock. While it is true that deceased owned considerable property at the time of his marriage to claimant, and thereafter, it is claimed, and not denied, that, before his death, he was having financial troubles. Whether the proper inferences to be drawn

from the testimony are that claimant loaned or gave to her husband money in 1908, or later, as she now claims; or whether the transaction was in 1908, and whether he put these moneys in the bank himself, taking certificates for some of them in his wife's name, and later drawing the money; or whether he was transacting his business, or a part of it, in his wife's name, because he was financially involved; or whether claimant, in good faith, loaned the money to her husband, and has a just claim against his estate, were not matters for the court.

The temptation to set up a claim against the estates of decedents is very great. The danger thereof and the quantity and quality of proof required are stated in *Holmes v. Connable,* 111 Iowa 298, 301. Some of the cases there say that the claim or contract should be clearly proved; that it is incumbent upon the court to look upon such evidence with great jealousy, and to weigh it in the most scrupulous manner. See, also, *McDonald v. Yellow Taxicab Co.,* 192 Iowa 1183, 1194. See, also, *Ross v. Ross,* 148 Iowa 729, 734, where the rule is stated as to admissions or declarations said to have been made by a deceased person. Cases somewhat analogous are those in regard to the good faith of a purchaser of negotiable paper. See *Arnd v. Aylesworth,* 145 Iowa 185, 191; *Connelly v. Greenfield Sav. Bank,* 192 Iowa 876, 880 to 887. See, also, *Thompson v. Burnsmeyer* (Iowa), 171 N. W. 584 (not officially reported). It is true that we have held that, in a case where a claim against an estate is made, it may be so clearly proved or the case may be so free from suspicion, that there should be a directed verdict. *Snyder v. Guthrie,* 193 Iowa 624, 630. This is true, also, in cases involving good faith in the purchase of negotiable paper. *Smith v. Breeding,* 196 Iowa 670, 672.

One or two other questions of minor importance are suggested. These relate to the admission of evidence. Without prolonging the opinion, it is enough to say that there may be some question as to whether it was incumbent upon claimant in the first instance to negative the thought of payment, if she had made a prima-facie case. Furthermore, we are inclined to think that there was evidence outside that of plaintiff, to show that she did not receive the proceeds of the certificate, at least *prima*

*facie.* We deem it unnecessary to further discuss that question, since it is not likely to arise on a retrial.

Appellant, in the reply brief, argues the proposition as to the presumption that, if claimant advanced money to her husband, it was a gift; and they say that, as bearing on whether claimant turned over the money to deceased as a loan or a gift, it is important to bear in mind that claimant married deceased when he was practically a wealthy man; that they had no children; that she brought only a limited amount to his estate, and thus became interested in his entire property; that it was but a reasonable presumption, which defendant had a right to present to the jury, that she was willing to contribute the small amount she had, and let it go in with the large amount he had, when she might receive, as she did, the full one half of his property. This point was not made in the opening argument, and in view of what we have said, we deem it unnecessary to discuss the matter. The question as to the statute of limitation is also argued. We have sufficiently referred to that.

As said, we are of opinion that the case is not one for a directed verdict for plaintiff. In so ruling, the trial court erred. The judgment is reversed, and the cause remanded.—*Reversed.*

ARTHUR, C. J., and EVANS and FAVILLE, JJ., concur.